VTR, INCORPORATED, Plaintiff,

v.

The GOODYEAR TIRE & RUBBER COM-
PANY and the Kelly-Springfield Tire
Company, Inc., Defendants.

No. 67 Civ. 2556.

United States District Court

S. D. New York.

July 30, 1969.

Shea, Gallop, Climenko & Gould, New York City, for plaintiff; Jesse Climenko, Bruce A. Hecker, Norman Friedman, Stephen Flechner, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendants; John F. Sonnett, David Ingraham, David R. Hyde, Allen S. Joslyn, New York City, of counsel.

## OPINION

BRYAN, District Judge:

Defendants, Goodyear Tire and Rubber Company (Goodyear) and Kelly-Springfield Tire Company (Kelly), move under Rule 12(b) F.R.Civ.P. to dismiss the amended complaint for failure to state a claim upon which relief may be granted and for summary judgment pursuant to Rule 56 F.R.Civ.P. Since affidavits have been submitted by the parties going beyond the allegations of the amended complaint, the motion will be treated as one for summary judgment.[1]

Plaintiff, VTR, Incorporated, commenced this action in the New York Supreme Court for the County of New York, alleging a single claim for breach of contract. Defendants removed the action to this court on grounds of diversity of citizenship. After removal, defendants, prior to answer, moved to dismiss the complaint for failure to state a claim for relief and for summary judgment. Thereupon, VTR served an amended complaint containing three counts. Count I alleged a somewhat modified claim for breach of contract. Counts II and III sought treble damages for violation of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2. Jurisdiction under Count I is based on diversity and under Counts II and III on the Federal antitrust laws.

The defendants then withdrew their motion directed to the original complaint and made the present motion addressed to the complaint as amended.

### I.  The Breach of Contract Count.

For a number of years prior to 1961, VTR was in the business of distributing and selling replacement tires[2] on a retail basis through leased automotive departments in department stores in a number of cities throughout the country. Such tires were sold mainly under the brand name "Vanderbilt" and the leased departments were known as "Vanderbilt Automotive Centers" (VAC).

In 1961, VTR sold the VAC business, its assets and property, to The B. F. Goodrich Co. (Goodrich), a large tire manufacturer, under an agreement providing for periodic payment of commissions to VTR. From 1961 until April 1965 Goodrich was the exclusive owner of the VAC business and operated it. According to VTR, by 1964 VAC had become one of the two principal operators of leased tire outlets in major department stores throughout the United States, with over-all annual net sales of approximately $20,000,000 and net annual sales of replacement tires exceeding $16,000,000.

---

1. It may be noted that the contract in suit which determines the rights of the parties was not annexed to the amended complaint but was submitted in defendants' affidavits.

2. Original equipment tires are tires sold to automobile manufacturers. Replacement tires are tires sold to car owners to replace worn out original equipment tires.

In 1965 there were disagreements between Goodrich and VTR concerning the VAC business and defendant Goodyear came into the picture. Goodyear is alleged to be the largest tire company in the world in terms of tire units manufactured and sold and its business includes the manufacture, distribution and retail sale of Goodyear replacement tires through company-owned stores, independent retailers and other outlets.

On April 2, 1965, two contracts were entered into by VTR. One, between VTR and Goodrich, provided for the repurchase of the VAC business, assets and property, with some exceptions, by VTR from Goodrich. The other, between VTR and Goodyear, provided for the purchase by Goodyear of the VAC business, assets and property being sold by Goodrich to VTR. It is the VTR-Goodyear contract which is the subject of the first count of the amended complaint.

The Goodyear-VTR contract recites (a) that Goodyear is desirous of acquiring the VAC assets being sold by Goodrich to VTR and of obtaining the services and advice of an organization with background and experience in the operation of leased automotive departments in department stores and (b) that VTR is willing to assign the Goodrich-VTR contract to Goodyear and to furnish such advice and services.

The contract, insofar as relevant here, provided in substance that:

VTR assigns to Goodyear the Goodrich-VTR contract and all of VTR's rights and benefits thereunder. (¶ 2).

Goodyear pays Goodrich the amounts which VTR was required to pay for the repurchase of the VAC business pursuant to the Goodrich-VTR contract. (¶ 3). This amounted to $8,800,000 at the closing plus $160,000 annually for 5 years. Goodyear also assumes all obligations of VTR under the Goodrich-VTR contract. Goodyear pays to VTR the sum of $2,-500,000 in two equal annual installments of $1,250,000 as an advance on commissions. (¶ 3–A).

VTR agrees to furnish Goodyear with advice in the establishment and operation of leased departments in department stores for a period of 20 years. As compensation therefor, Goodyear agrees to pay VTR the commissions provided in the contract. However, Goodyear may terminate this portion of the agreement at any time "with or without cause" but, if the termination is other than by discontinuance of the operation of all contract stores, commissions as provided by the contract continue to be payable to VTR as liquidated damages. (¶ 4). If commissions are due they are payable during the first 10 years of the contract at 3½% of net sales of contract stores and during the second 10 years at 2% of net sales up to $16,000,000 and 1% of net sales in excess of that sum. In any event no commissions are payable after 20 years. Each year $420,000 will be deducted from commissions payable and retained by Goodyear until the aggregate is $3,752,000, with a carryover in case commissions in any year do not reach that sum. The retained amounts "are, among other things, in repayment of the advance on commissions of $2,500,000 paid by Goodyear to VTR." However, such advances do not otherwise have to be repaid by VTR. (¶ 5).

Contract stores are defined in paragraph 6 as those owned by corporations listed on an exhibit to the Goodrich-VTR contract (with various exceptions) in which Goodyear shall operate outlets and "such other stores, if any, as Goodyear, in its uncontrolled discretion, may classify as contract stores." Paragraph 6 then provides:

"An outlet that has been included as a Contract Store shall remain a Contract Store for the balance of the term of this Agreement, subject to the following provisions of this paragraph 6. It is of the essence of this Agreement and it is recognized and agreed by VTR that Goodyear is purchasing outright and absolutely the Property defined and described in Section 1.01 of the Goodrich-VTR Contract; that Goodyear is under no obligation to VTR to

operate or to refrain from operating any particular Contract Store or to open any particular outlet; that Goodyear, in its uncontrolled discretion, may sell Vanderbilt, Princeton or Major tires to or through any person, firm or corporation without thereby rendering the store of such person, firm or corporation a Contract Store and without thereby becoming otherwise obligated to VTR in any respect; that Goodyear, in its uncontrolled discretion, may make all decisions respecting operations and the extent and intensity thereof, as well as respecting discontinuance of operation of any of the Contract Stores or all the Contract Stores; and that, with respect to the matters referred to in this sentence, Goodyear may make decisions solely in the light of Goodyear's own interest and without liability or obligation of any kind to VTR in connection therewith, except to pay commissions as above provided with respect to such Contract Stores as are then being operated by Goodyear."

Finally it is provided (¶ 14):

"This Agreement represents the sole and entire agreement between the parties hereto and there does not exist any other agreement, understanding or arrangement with respect to the subject matter hereof. This Agreement may be amended or modified or provisions hereof waived only by another written instrument signed by the party against whom enforcement of the amendment, modification or waiver is sought. Any attempted oral amendment, change or waiver shall be void and ineffective."

On May 7, 1965 Goodyear assigned the VTR-Goodrich contract to its subsidiary Kelly-Springfield as the contract permitted. On May 10, 1965 the closing took place. Kelly has since operated the VAC business. The initial payments to Goodrich and VTR have been made and VTR has since been receiving commissions on net sales in contract stores in excess of the $420,000 per annum withheld against advances.

The gravamen of Count I of the amended complaint is that after acquiring the VAC business, Goodyear and Kelly, pursuant to plan, failed to operate the business in good faith and wilfully caused the business to deteriorate and its tire sales to diminish thus depriving VTR of part of the consideration to be paid for such business and impairing its overall value and the plaintiff's property interest therein, in breach of the contract.

The amended complaint alleges in substance that: Goodyear purchased the VAC business for the purpose of suppressing and diminishing Vanderbilt brand tire sales and concealed such intent from VTR at the time of purchase. After acquiring the business, Goodyear and Kelly deliberately engaged on a course of conduct designed to achieve that end, in order to reduce the competitive impact of VAC's department store outlets on the sales of the higher priced Goodyear tire by franchised dealers, and other Goodyear outlets.

Goodyear and Kelly persisted in this course of conduct in bad faith despite VTR's protests. As a result, in the two years following the purchase, Vanderbilt tire sales drastically decreased although tire sales generally significantly increased; the number of VAC department store outlets which were required, because of insufficient volume, to pay minimum lease guaranties rose from 6 to 45; the growth pattern of VAC tire sales was drastically reduced; and its department store business was substantially impaired.

The acts and conduct of Goodyear and Kelly in bad faith included the closing of desirable outlets without economic justification and the imposition of inordinate price increases through the use of fraudulent practices and devices.

All this is alleged to have injured VTR's interest in the VAC business by reducing its commissions on net sales payable over a 20-year period to VTR's substantial damage and was a breach of the VTR-Goodyear contract.

VTR does not contend that any express provisions of the VTR-Goodyear contract was breached. It proceeds on the theory that under New York law[3] a covenant is implied that Goodyear, as purchaser, and Kelly, as its assignee, must act in good faith in the operation of the VAC business and that their allegedly wilfull and intentional conduct in bad faith, which resulted in the diminution of the VAC business in order to benefit Goodyear's other business, was a breach of the covenant to VTR's substantial damage.

Defendants, while they do not dispute the proposition that parties to a contract must generally act in good faith, contend that the express provisions of the contract gave them the absolute right to do everything which they are charged with doing in Count I of the amended complaint. They say that under these circumstances the allegations of bad faith are merely the plaintiff's characterization of acts and conduct expressly authorized by the contract and without any legal significance, and that no covenant against acting in the manner which they did can be implied in view of the provisions of the contract expressly giving them such rights.

Thus, the issue raised here is a relatively simple one. Assuming that defendants engaged in all of the acts and conduct charged in Count I of the amended complaint, had they the right under the express provisions of the contract to do what they are charged with doing or was there an implied covenant which they violated forbidding them to engage in such acts and conduct wilfully and intentionally?

VTR relies on the proposition that under New York law "in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied

covenant of good faith and fair dealing," Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). VTR contends that the bulk of the consideration for the transfer of the VAC business was to be in the form of commission payments during a 20-year period based on net sales of contract stores and that under these circumstances such a covenant of good faith and fair dealing is essential, citing, e. g., Albemarle Theatre, Inc. v. Bayberry Realty Corp., 27 A.D.2d 172, 277 N.Y.S.2d 505 (1st Dep't 1967); Tuttle v. W. T. Grant Co., 5 A.D.2d 370, 376–384, 171 N.Y.S.2d 954 (4th Dep't 1958) (dissenting opinion).[4] See also 3 Corbin, Contracts, § 568, pp. 331–334 (1960).

There is no doubt that these cases lay down a generally sound principle of contract law. However, they all are distinguishable from the case at bar for the reason that the provisions of the VTR-Goodyear contract are quite different from the provisions of the contracts involved in any of them. The general rule which these cases lay down is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing. As Corbin states:

"In any commercial agreement in which the compensation promised by one to the other is a percentage of profits or receipts, or is a royalty on goods sold, manufactured or mined, there will nearly always be found an implied promise of diligent and careful performance in good faith and of forbearance to make performance impossible by going out of business or otherwise. *Such implications may, of course, be excluded by appropriate language in the agreement; it is excluded by language with which the proposed implication would be in con-*

---

3. The contract expressly provides that it shall be "construed and enforced" in accordance with New York law. (¶ 17)

4. The appellate division decision in *Tuttle* was reversed without opinion by the New York Court of Appeals. 6 N.Y.2d 754, 186 N.Y.S.2d 655, 159 N.E.2d 202 (1959).

*flict."* 3 Corbin, Contracts, § 568, pp. 331–334 (1960). (Emphasis added)

This is in accord with the general principle that, in interpreting a contract "an implication * * * should not be made when the contrary is indicated in clear and express words." 3 Corbin, Contracts, § 564, p. 298 (1960). As stated in the early case of Burr v. Stenton, 43 N.Y. 462, 464 (1871):

"The rule, that where the instrument contains an express covenant in regard to any subject, no covenants are to be implied in respect to the same subject, is too familiar to require more than its statement."

See also Emigrant Indus. Sav. Bank v. 108 W. 49th St. Corp., 255 App.Div. 570, 8 N.Y.S.2d 354 (1st Dep't 1938), aff'd, 280 N.Y. 791, 21 N.E.2d 620 (1939).

In Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944), plaintiffs sued on an exclusive license agreement covering the manufacture and sale of ice trays for mechanical refrigerators under patents owned by the plaintiff. It was alleged, among other things, that in violation of an implied obligation so to do, defendant had failed to exploit the licensed inventions in good faith and to refrain from adopting commercially equivalent devices outside the scope of the licensed patents. The court recognized that there was an implied covenant to work the patents in good faith so as to make them produce royalty income. However, the license agreement expressly permitted the defendant to make and sell a type of ice tray royalty-free, even though such sales substantially reduced sales of the types of tray on which royalties were required to be paid. This the defendant concededly had done. The court held that such conduct did not breach the implied covenant to exploit the patent in good faith, stating:

*"The exercise of good faith in exploiting the licensed patents did not require the defendant to refrain from doing whatever the plaintiffs had expressly agreed that it might do.* No obligation not to manufacture and sell whatever kind of trays the license gave the defendant the right so to manufacture and sell can be implied and of course there can be no breach of a non-existent obligation." 144 F.2d at 726 (Emphasis added)

No case has been cited and I know of none which holds that there is a breach of an implied covenant of good faith and fair dealing where a party to a contract has done what the provisions of the contract expressly give him the right to do. Thus, in the case at bar, the provisions of the VTR-Goodyear contract must be carefully examined to determine whether the defendants by its express terms and provisions were given the right to engage in the acts and conduct with which they are charged in Count I. As to acts and conduct authorized by the express provisions of the contract, no covenant of good faith and fair dealing can be implied which forbids such acts and conduct. And if defendants were given the right to do what they did by the express provisions of the contract there can be no breach.

It will be recalled that the prime consideration for the transfer of the VAC business from Goodrich to Goodyear was the payment by Goodyear of a total of $9,600,000 to Goodrich and of $2,500,000 to VTR. The payment to VTR was described as an advance on commissions, among other things, but in fact was not repayable by VTR except by deductions from commissions which might become due and thus VTR was assured of receiving at least this sum.

The commissions to be paid to VTR under the contract are to be compensation for advice to be furnished by VTR in the establishment and operation of leased departments in department stores. Commissions are payable only on net sales in contract stores as defined in the contract. The agreement for the furnishing of advice by VTR and payment of commissions therefor, while it may continue for a period not to exceed 20 years, may be terminated by Goodrich at any time with or without cause. It is

contemplated that the termination may occur by discontinuance by Goodyear of all of the contract stores. But if this does not occur, commissions on contract stores which still may be operated continue as liquidated damages.

Thus the contract is not, as VTR argues, one requiring payment of commissions for a period of 20 years. On the contrary, whether or not commissions continue (other than as liquidated damages) and on what sales in what contract stores, if any, they are payable, depends entirely on whether Goodyear terminates the arrangement for advice by VTR or discontinues all or some of the contract stores.

Since, as is plain, commissions are entirely dependent on the operation of contract stores by Goodyear, the provisions of paragraph 6 dealing with this subject are the key to the question posed here. Under paragraph 6, it is "of the essence" of the agreement (1) that Goodyear "in its uncontrolled discretion" may sell Vanderbilt or other tires to or through any person, firm or corporation, without making the store of such person, firm or corporation a contract store and "without becoming obligated to VTR in any respect"; and (2) that Goodyear "in its uncontrolled discretion" may make all decisions as to the operations and their extent and intensity and respecting discontinuance of any or all contract stores. Moreover, such decisions may be made "solely in the light of Goodyear's own interest and without any liability or obligation to VTR in connection therewith, except to pay commissions as provided in the contract on such contract stores as are then being operated."

When the allegations of the amended complaint are examined in the light of these contract provisions, it becomes plain that Goodyear and Kelly had the right under the contract to engage in all of the acts and conduct with which they are charged in Count I. The broad charge is that defendants engaged in a course of conduct designed to reduce the competitive impact of the VAC contract stores on sales of Goodyear tires through various acts and devices and that they succeeded.

Goodyear is given the right by express terms of the contract to make all decisions respecting where and how all tires are to be sold; how and in what manner the contract stores are to be operated; the extent and intensity of such operation and whether any or all such contract stores shall be discontinued in its "uncontrolled discretion". All these decisions may be made by Goodyear "solely in its own interest and without any liability or obligation to VTR".

This language in clear and unambiguous terms gave Goodyear the right to do such specific things as imposing higher prices for Vanderbilt tires; reducing advertising and promotional outlays; closing and failing to open VAC outlets; failing to expand VAC markets; and offering different quality tires for sale in VAC outlets at higher prices. It is difficult to see what other purpose could be served by such extraordinarily broad language.

The allegations that the acts charged were done "wilfully and intentionally" add nothing to the legal posture of the plaintiff's claim. If, as admitted by the defendants for purposes of this motion only, the acts charged were done, of course they were done wilfully and intentionally, since they were the result of decisions made by Goodyear which the contract authorized Goodyear to make.

Nor are the allegations that defendants engaged in this course of conduct for the purpose of building up their other business to the detriment of the VAC business of any legal significance. Since Goodyear was entitled to make decisions solely in its own interest, whatever that interest might be, without obligation to VTR, if it decided that its interests lay in that course, it had the right to pursue it. It may be noted that Goodyear is not charged with doing anything for anyone's benefit other than its own.

The allegations that the defendants acted in bad faith are mere characterizations by the plaintiffs and add

nothing to their claim for relief. Whether or not the acts and conduct of the defendants are in bad faith is to be determined here by whether or not they had the right to engage in them under the contract. Since they had such right, defendants cannot be said to have acted in bad faith.

VTR claims that if the contract is construed so as to give Goodyear and Kelly the right to do what they are charged with doing, plaintiff will be stuck with a bad bargain. Whether this is so or not is questionable in view of the $2,500,000 which VTR received and was not required to return and the total amount of $9,600,000 paid to Goodrich. But if VTR did get a bad bargain that is what it agreed to and it is bound by its agreement.

There is no doubt that plaintiff entered into this contract with its eyes open. It engaged in arms length negotiations in which it was represented by highly competent counsel who certified that the contract was valid and binding and enforceable in accordance with its terms.

Finally, the allegation that Goodyear entered into the contract with the intention "not to operate the VAC business in good faith" merely amounts to a charge that Goodyear intended to do what it is charged with doing. Since it was given the right to do that by the contract, no liability can arise because it had the intention so to do. The contract provides that it "represents the sole and entire agreement between the parties hereto and there does not exist any other agreement, understanding or arrangement with respect to the subject matter hereof." As Mr. Justice Holmes put it, perhaps rather broadly,

"[T]he making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties' having *meant* the same thing but on their having *said* the same thing." Holmes, "The Path of The Law," 10 Harv.L.Rev. 457, 464 (1897)

In view of the terms of the contract there are no issues of fact which require trial. I conclude that as a matter of law plaintiff is not entitled to recover for breach of the VTR-Goodrich contract on the basis of the allegations of the amended complaint. Defendants' motion for summary judgment on Count I must therefore be granted.

## II. *The Antitrust Counts.*

Counts II and III of the amended complaint, charging respectively violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), seek treble damages under Section 4 of the Clayton Act for alleged injury to VTR's business and property by reason of the defendants' acts and conduct, in connection with the VTR-Goodyear contract, which are the subject of Count I.

Count II charges a conspiracy by Goodyear and its subsidiary and assignee Kelly, beginning in early 1965, to restrict interstate commerce in replacement tires by acquiring the VAC business and operating it "not in good faith" so as to diminish and suppress replacement tire sales through VAC outlets and the VAC share of the replacement tire market. It is alleged that at that time department store outlets such as those operated by VAC, which offered many advantages to the consuming public, were rapidly growing and securing an increasingly larger share of the replacement tire market in competition with Goodyear tire outlets.

It is further alleged that in pursuance of the conspiracy, Goodyear and Kelly acquired the VAC business under the VTR-Goodyear contract and engaged in the acts and conduct alleged in Count I as the basis of VTR's claim for breach of contract in order to reduce the competitive impact of the VAC business upon Goodyear tire outlets and the Goodyear replacement tire price structure.

Defendants' course of conduct is alleged to have drastically reduced VAC's net sales and its share of the replacement tire market and to have reversed its growth trend during a period when re-

placement tire sales through department store outlets were steadily and substantially increasing. As a result, it is claimed that "the rights, interests and property" of VTR in the VAC business were substantially impaired and there was also damage to department stores having replacement tire outlets and to the consuming public.

Count III alleges that the acts and conduct of the defendants described in Count II also constituted an attempt and conspiracy to monopolize interstate commerce in department store sales of replacement tires in violation of Section 2 of the Sherman Act.

Defendants first contend that they are entitled to summary judgment on Counts II and III on the ground that under Section 4 of the Clayton Act plaintiff lacks standing to sue on the antitrust claims alleged.

Section 4 of the Clayton Act (15 U.S.C. § 15) which authorizes private antitrust suits for treble damages provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

It is the defendants' position that, assuming for purposes of this motion that the facts alleged in Counts II and III are true, and that the conduct alleged was forbidden by the antitrust laws, plaintiff has failed to show that it had been injured in its business or property by these violations within the meaning of Section 4.

Despite the lack of any language of limitation in Section 4, it is by now well settled that the right to sue under Section 4 is restricted.[5] Those who are directly injured in their business or property by forbidden conduct have standing to sue. Persons indirectly or incidentally injured are denied such standing.

The Court of Appeals for this Circuit, in Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. den., 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956) held that plaintiffs had no standing to sue and stated the rule as follows:

"Those harmed only incidentally by anti-trust violations have no standing to sue for treble damages; only those at whom the violation is directly aimed, or who have been directly harmed may recover.

\* \* \* \* \* \*

"Shareholders and officers of corporations as well as creditors and landlords have been held not to have standing to sue for treble damages. * * * Undoubtedly, such persons suffer some financial loss when anti-trust violations are directed against the corporations in which they have an interest. But not every financial loss due to an anti-trust violation, however remote, gives a right of action." (citations omitted) Id. at 679

In Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322 (S.D.N.Y.1959), holding that plaintiffs had standing under Section 4 to sue some of the defendants but not others, Judge Weinfeld pointed out:

"A fairly general pattern has emerged from this concept. The following plaintiffs have been held to be without standing to sue for treble damages under the antitrust laws: (1) a patent owner who licenses his patents to a manufacturer on a royalty basis, for loss of royalties on sales which would have been made but for the antitrust conduct of defendants; (2) shareholders, officers and creditors of corporations for diminution in value of ownership, loss of earnings or impairment of corporate ability to pay, due to the impact of antitrust conduct on the corporation; (3) nonoperating motion picture landlords for depreciation in market value of the

---

5. See generally Note, Standing to Sue for Treble Damages Under Section 4 of The Clayton Act, 64 Colum.L.Rev. 570 (1964);

Pollock, The "Injury" and "Causation" Elements of a Treble Damage Antitrust Action, 57 Nw.U.L.Rev. 691 (1963).

property or loss of rents attributable to antitrust violations relating to the showing of pictures at the theatres operated by their lessees; (4) an insurance broker for loss of income due to a conspiracy to deprive the company which he represented of a particular contract; (5) a supplier of raw materials for loss of sales resulting from conduct restricting the business of its major customer." (Footnotes and cases cited therein omitted.) Id. at 327–328.

In the latest case in this circuit, SCM Corp. v. Radio Corporation of America, 407 F.2d 166 (2d Cir. 1969), cert. den., 395 U.S. 943, 89 S.Ct. 2014, 23 L.Ed.2d 461 (Sup.Ct.1969), which held that the defendant had no standing under Section 4 to maintain an antitrust counter-claim, the Court said,

"The Supreme Court has said that 'the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws' [Perma Life Mufflers v. Int'l Parts Corp., 392 U.S. 134, 139, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)]. But the 'private action' is created by section 4 of the Clayton Act, 15 U.S.C. § 15. Standing to sue was not given by Congress to any and every citizen who, motivated by public spirit or possibly some baser reason, would set himself up as a watchdog of business behavior. Congress properly bestowed the right to sue only on such persons as might be injured in their business or property *by reason of* anything forbidden in the antitrust laws." Id. at 171.

The decided cases generally agree that in order to confer standing to sue under Section 4 direct rather than indirect or incidental injury to a plaintiff is required. However, it is not at all clear whether the forbidden conduct must be aimed directly at the plaintiff or that plaintiff's property interest alleged to have been injured must not be too remote or both.[6] The comment of the Court of Appeals in Productive Inventions, Inc. v. Trico Products Corp., supra, is significant:

"No hard and fast rule can be laid down in these situations as the line between direct and incidental damage is not always definable with clarity." *Id.*, 224 F.2d at 680.

The case at bar does not fall squarely within the ambit of any of the cases which thus far have dealt with the subject of standing to sue under Section 4. In none of the prior cases was the relationship between the plaintiff and the defendant remotely similar to that established by the VTR-Goodyear contract.

Whether or not VTR has standing to sue under Section 4 must be viewed in the light of the relationship between the parties created by the contract and their respective interests in its subject matter. The first criterion of Section 4 is that a person "shall be injured in his business and property". VTR had not owned the VAC business for some four years prior to the execution of the VTR-Goodyear contract. It did not resume ownership of the business at any time before the business was transferred to defendants. For all practical purposes, transfer of the VAC business was made directly by Goodrich. Moreover, the contract pro-

6. The lower court decisions in this circuit are not in accord on the application of the standing doctrine. *Compare* Lieberthal v. North Country Lanes, Inc., 221 F.Supp. 685 (S.D.N.Y.1963) (dictum), aff'd on other grounds, 332 F.2d 269 (2d Cir. 1964) and Skouras Theatres Corp. v. Radio-Keith-Orpheum Corp., 193 F.Supp. 401 (S.D.N.Y.1961) *with* Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322 (S.D.N.Y.1959) and Erone Corp. v. Skouras Theatres Corp., 166 F.Supp. 621 (S. D.N.Y.1957). Similarly, the decisions in other circuits are not in harmony. *Compare* Harrison v. Paramount Pictures, Inc., 115 F.Supp. 312 (E.D.Pa.1953), aff'd, 211 F.2d 405 (3d Cir.), cert. denied, 348 U.S. 828, 75 S.Ct. 45, 99 L. Ed. 653 (1954) and Melrose Realty Co. v. Loew's, Inc., 234 F.2d 518, (3d Cir.) (per curiam), cert. denied, 352 U.S. 890, 77 S.Ct. 128, 1 L.Ed.2d 85 (1956) *with* Congress Building Corp. v. Loew's, Inc., 246 F.2d 587 (7th Cir. 1957).

vided, "It is of the essence of this agreement and it is recognized and agreed by VTR that Goodyear is purchasing outright and absolutely" the VAC business. Upon acquisition under the contract, Goodyear or its assignee Kelly, became the sole owner and operator of the VAC business.

It will be recalled that, once the initial $2,500,000 had been paid to VTR, under the express terms of the contract the only right to payment which VTR had was to receive commissions from such contract stores as continued to be operated by Goodyear, in return for advice on operations; that this arrangement could be cancelled by Goodyear at any time, with or without cause; and that Goodyear had the right "in its uncontrolled discretion" to determine prices to be charged, the manner, extent and intensity of the operation of the contract stores and whether any or all such stores should be discontinued. All these decisions could be made by Goodyear solely in its own interest and without liability or obligation of any kind to VTR.

Thus, VTR was not in any sense owner of the VAC business nor was the VAC business its "property". The only interest which VTR had having any connection with the VAC business arose from the contract itself. Such interest consisted solely of VTR's rights to commissions as limited and circumscribed by Goodyear's rights to engage in the course which it pursued. As I have already held with respect to Count I, there was no obligation on Goodyear's part to continue to operate the VAC business or any part of it, in good faith or otherwise. Whether or not commissions continued to become due to VTR was entirely dependent upon what action Goodyear chose to take in its own discretion and solely for its own benefit.

The conduct alleged to have been engaged in by Goodyear and its assignee Kelly may have been in violation of the antitrust laws as alleged in Counts II and III and on this motion it must be assumed that it was. But whether it was or not VTR had no property interest in the VTR-Goodyear contract or in the VAC business which could be injured by such conduct. This is because under the terms of the contract VTR's interest was limited, circumscribed and subject to the exercise by Goodyear and Kelly of their extraordinarily broad contract rights, many of which they had already exercised.[7]

This case is quite different from Schwartz v. Broadcast Music, Inc., 180 F.Supp. 322 (S.D.N.Y.1959) on which VTR relies. There, on one branch of the case, plaintiff composers had assigned their copyrights to music publishers in return for royalties. The defendants in furtherance of their conspiratorial objectives had induced the publishers to withhold exploitation and marketing of plaintiffs' compositions by making payments to them which removed their incentive and interfered with their duty under their contracts with plaintiffs. In holding that plaintiffs had standing to sue the defendants on these claims, Judge Weinfeld pointed out:

"The fact that the plaintiffs divested themselves of the publishing and recording rights does not deprive them of standing to sue. They could receive royalties only if the publishers, in good faith, worked their compositions. Here the charge is that the very function which the publishers undertook to perform had been interfered with and rendered sterile by the acts of the defendants." *Id.* at 336.[8] When the terms of the VTR-Goodyear contract are recalled[9], the contrasts be-

---

7. It should be noted that the specific acts and conduct with which defendants are charged in Counts II and III are within the scope of the rights granted to them by the contract.

8. It may be noted that on another branch of the case, Judge Weinfeld held that plaintiffs had no standing to sue for loss of royalties on non-dramatic performance rights because their injury was incidental and indirect.

9. See discussion of Count I, *supra,* at 3–20.

tween the case at bar and Schwartz are readily apparent.

VTR is not a person "injured in his person or property by reason of anything forbidden in the anti-trust laws" and has no standing to sue these defendants for such violations of the antitrust laws as may be alleged in Counts II and III. This is plain from the record before me and there are no issues of fact which require a trial. Defendants are entitled to summary judgment on Counts II and III.[10]

Of course this is not to say that department stores in which VAC replacement tire outlets were operated or others whose business or property may have been injured by defendants' conduct may not have standing to sue for any anti-trust violations charged in Counts II and III. All I hold is that VTR has no standing to sue under the circumstances present here.

Defendants' motion for summary judgment dismissing all counts of the amended complaint is granted and judgment will be entered accordingly.

It is so ordered.

---

10. This makes it unnecessary to reach defendants' contention that plaintiff is barred from recovery by the *in pari delicto* doctrine.