

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-8-1994

# U&W Industrial Supply, Inc. v. Martin Marietta Alumina, Inc.

Precedential or Non-Precedential:

Docket 93-7318

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"U&W Industrial Supply, Inc. v. Martin Marietta Alumina, Inc." (1994). *1994 Decisions.* Paper 129.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/129

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 93-7318

———————


U&W INDUSTRIAL SUPPLY, INC.,
Appellant

v.

MARTIN MARIETTA ALUMINA, INC.


———————

No. 93-7350

———————


U&W INDUSTRIAL SUPPLY, INC.

v.

MARTIN MARIETTA ALUMINA, INC.


MARTIN MARIETTA ALUMINA PROPERTIES, INC.,
Appellant

———————

Appeal from the District Court of the Virgin Islands
(D.C. Civil Action No. 85-00195)

———————

Argued:  December 2, 1993

PRESENT:  MANSMANN, HUTCHINSON and LEWIS, <u>Circuit Judges</u>

(Filed September 8, 1994)

———————

Thomas Alkon, Esquire

Alkon, Rhea & Hart
2115 Queen Street
Christiansted, St. Croix, U.S.V.I.   00820

          and

Arthur Newbold, Esquire              (Argued)
Kathleen Milsark, Esquire
Dechert, Price & Rhoads
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA   19103-2793
               Attorneys for U&W Industrial Supply, Inc.

Diane Trace Warlick, Esquire
Warlick & Quigley, P.C.
P.O. Box 3209
Christiansted, St. Croix, U.S.V.I.   00822

          and

R. Eric Moore, Esquire
Downtown Station
P.O. Box 3086
Christiansted, St. Croix, U.S.V.I.   00822

          and

Henry L. Feuerzeig, Esquire          (Argued)
Dudley, Topper and Feuerzeig
P.O. Box 756
St. Thomas, U.S.V.I.   00804
               Attorneys for Martin Marietta Alumina, Inc.

———————————

OPINION OF THE COURT

———————————

HUTCHINSON, <u>Circuit Judge</u>.


          In this appeal and cross-appeal, appellant U&W

Industrial Supply, Inc. ("U&W") contends that a judgment for

damages of $27,790.19 entered by the District Court of the Virgin

Islands on U&W's requirements contract claim is inadequate. U&W argues that the district court erroneously held U&W had a duty to mitigate damages arising from appellee and cross-appellant Martin Marietta Alumina Properties, Inc.'s ("MMA's") breach of contracts, styled by the parties "blanket order contracts," under which U&W agreed to supply MMA's requirements of certain parts and supplies.

MMA, in its cross-appeal, argues that the district court should have entered judgment in its favor on U&W's breach of contract claims. MMA contends that the district court erred in awarding partial summary judgment to U&W on the theory that MMA breached a duty of good faith which the law implies in all commercial contracts. The district court implied a thirty day notice provision into the blanket order contracts because it felt MMA had breached this good faith duty when it failed to give U&W thirty days notice before canceling individual purchase orders it had the option of placing under its blanket order contracts with U&W. The district court's holding had the effect of adding a second thirty day notice provision to blanket order contracts which had only expressly required MMA to give U&W thirty days notice of a change in production levels at MMA's St. Croix aluminum ore processing facility.

Because MMA's requirements did not end, and its production levels did not vary substantially from those the requirements contracts were based on, until it actually closed its Virgin Island plant operations in May of 1985, we conclude that the court erred in implying this second thirty day notice

provision into the contracts.  Moreover, because uncontradicted evidence in this record establishes that the production levels on which U&W's obligation to maintain its own inventories was based never decreased before the plant closed in May of 1985, we also conclude that there is no disputed issue of material fact whose resolution in U&W's favor would permit it to prevail under applicable substantive law.  Therefore, we will reverse the district court's order entering partial judgment for U&W and its order denying MMA's cross-motion for summary judgment and remand with instructions to enter an order granting summary judgment to MMA.

## I.  Statement of Facts

U&W is an industrial piping and valve supplier located on the island of St. Croix in the United States Virgin Islands ("Virgin Islands").  MMA operated an aluminum processing plant on St. Croix until May of 1985.  From time to time, prior to 1983, MMA purchased large quantities of industrial piping and valves from U&W for use in MMA's aluminum processing operations under individual purchase orders.  MMA's orders constituted 90% of U&W's business.

In 1982, MMA decided to implement a blanket order system for the purchase of materials.  In doing so it joined an industry trend toward the use of blanket orders as a means of better competing against the Japanese.  Before adopting the blanket order system, MMA had maintained a six month supply of the materials U&W was supplying.  It wanted to reduce its

inventory to a one week supply and rely on contractors to supply those items and other materials as needed. As finally adopted, MMA's blanket ordering system required suppliers who signed on to maintain inventories adequate to meet MMA's usual production levels but required MMA to place only one order within ninety days of signing. MMA was then free to place, or not place, orders as it saw fit.

U&W was one of the suppliers who signed on after responding to MMA's invitations to bid on some of the blanket order contracts. U&W submitted bids for valves, instrumentation, gaskets, electrical supplies, fittings and piping. On these items U&W's bid was the lowest and MMA awarded U&W requirements contracts for these items under the terms of the blanket order contracts. In its invitations to bid, MMA had included an analysis of its inventory needs that gave part numbers and descriptions of the items required, its levels of use or consumption of each for the current and prior year and the maximum quantity MMA had previously kept in inventory. These blanket contracts were drafted by MMA and were offered to U&W on a "take-it-or-leave-it basis." Brief for Appellee at 6. U&W attempted to negotiate the terms of the blanket contracts but MMA's purchasing manager informed U&W the agreement could not be modified. U&W then accepted the blanket contracts as MMA had presented them.

The parties executed four of the five blanket contracts at issue on December 23, 1983 and these were designed to run from January 1, 1984 to December 31, 1984. The fifth contract ran

from July 1, 1983 to June 30, 1984.  Except for the description of the products required, all five contained identical terms and conditions.  Under each, U&W was obligated to maintain an inventory of each specific part adequate to supply MMA's needs at its current level of production.  U&W understood the agreement obligated it to carry a ninety day supply of each part for MMA until the term of that blanket contract expired or it was otherwise terminated by one of the parties.  Paragraph 19 of the blanket contracts stated:

> 19.  <u>ESTIMATED QUANTITY OF PRODUCT</u>
>
> Estimated quantity of PRODUCT  required and release activity as defined in Exhibit A, is based on current production levels at <u>[]</u> <u>Tons</u>.  [MMA] reserves the right to change production levels at its sole discretion.  In the event of any cahnges [sic] in production levels, [MMA] will notify vendor of either a reduction in PRODUCT quantities or increase in PRODUCT quantities to the maximum level set forth in Exhibit A.  Any increase beyond the maximum level set forth in Exhibit A will require written agreement between [MMA] and [U&W].

Joint Appendix ("Jt. App.") at 248.  Each blanket contract expressly obligated MMA to place only one order within the first 90 days, but each agreement also specifically stated MMA intended to place follow-up orders with U&W, despite MMA's disclaimer of any obligation to do so.  Each blanket contract contained a cancellation provision:

> 18.  <u>CANCELLATION</u>
>
> (a)  [MMA] may cancel this agreement upon thirty (30) days written notice, at its sole discretion, <u>provided however</u>, that [MMA]

shall remain obligated to pay for any PRODUCT order hereunder proir [sic] to the effective date of any such cancellation. [MMA] may cancel any individual Purchase Order or release placed hereunder, subject to payment for materials committed to the manufacture of PRODUCT ordered hereunder prior to the time of such cancellation. No other cancellation charges shall apply.

Id. (emphasis in original).

In mid-1984 MMA sought purchasers for its St. Croix plant. In order to maintain the plant as a going concern pending its sale, MMA wanted to cut plant operating costs but still maintain production at pre-existing levels. In July of 1984, to help accomplish this, MMA decided to reduce all its inventories. Accordingly, on July 20, 1984 MMA sent U&W reduction orders canceling or reducing individual purchase orders it had already placed under the blanket contracts. MMA informed U&W that MMA was reducing its inventory without changing its production levels but cautioned U&W against ordering certain items to replenish stock until MMA advised it to. Nevertheless, U&W states it never received any notice of decreased requirements from MMA.

In response to the July 20, 1984 reduction orders and MMA's cautions, U&W decreased its own inventory of the items it had agreed to supply MMA, even though MMA's production levels remained the same. Glenn Knorr, a U&W officer, testified on deposition:

A:  [After receiving the reduction orders, U&W] did not continue to order products and material to reinforce [our] inventories. [With respect to the blanket contract for piping,] I spoke

> specifically with [James Ross ("Ross"), head of purchasing for MMA's St. Croix plant] and asked him, look are we going to have to order a fair amount of pipe in order to adhere to this contract and he advised me verbally again that I should hold off on ordering any pipe until he advised me again.  So at that time we [held off].
>
> * * *
>
> Q: . . . After June or July of 1984 [sic] then you stopped ordering from your suppliers to replenish your inventories?
>
> A: That's correct.

Jt. App. at 319-20.

On October 16, 1984 MMA's parent corporation publicly announced it was withdrawing from the aluminum business.  The announcement, as well as MMA's subsequent efforts to locate a buyer for its St. Croix plant, were well publicized but efforts to sell the plant failed.  U&W conceded it knew of MMA's attempts to sell the St. Croix plant as early as the spring of 1984 but was continually reassured by MMA that it would be "business as always," Jt. App. at 319, and MMA had assured U&W that if it could sell the plant as a going concern, U&W's contracts would pass to the new owner.  Also, even though U&W knew MMA's St. Croix plant was for sale, it believed MMA's reduction of its parts inventory would somehow, in the end, increase U&W's sales because MMA would have to rely even more heavily on U&W to make timely delivery of parts MMA needed.

When the St. Croix plant closed, U&W unsuccessfully attempted to dispose of its remaining supply of the parts that were the subject of its requirements contracts with MMA. U&W also offered MMA an exchange of those parts it could not sell on the island for parts that could be sold there, dollar for dollar, but MMA refused this exchange offer. U&W eventually sold some of the parts to a salvage company.

## II. Statement of Procedural History

On August 12, 1985 U&W filed this action against MMA. The complaint sought damages for breach of contract, contending U&W was entitled to actual, formal notice in July, 1984 of MMA's decreased needs so that U&W could make appropriate adjustments in its own inventory levels. U&W alleged MMA had failed to give notice of a decrease in its production level and that this was a breach of the governing agreements. Both parties filed motions for summary judgment on liability. On April 24, 1987 the late Chief Judge David V. O'Brien granted partial summary judgment in favor of U&W after concluding MMA "constructively canceled" five of the contracts when it implemented internal inventory reductions in July of 1984 without advance notice to U&W and that this breached an implied obligation of good faith and fair dealing reciprocal to U&W's express contractual duty to maintain an inventory "adequate" to meet MMA's requirements. The court held U&W was entitled to thirty days' notice of MMA's changed needs because MMA had an express contractual right to terminate the blanket contracts on thirty days' written notice. Judge

O'Brien granted summary judgment to MMA on the remaining liability issues and ordered a hearing at a later date to determine damages.[1]  He issued two additional orders on July 16, 1987 and September 21, 1987 concerning the damages U&W would be permitted to prove.  Under these orders, U&W was limited to damages resulting from its inability to dispose of inventory acquired during the thirty days immediately prior to U&W's receipt of MMA's reduction orders.[2]  If U&W had thirty days advance notice of MMA's construction cancellation, the court reasoned that U&W would not have purchased any additional inventory during this thirty day period.  The court did not permit U&W to recover damages for the inventory it had on hand but could not return prior to the date notice was required.

Judge O'Brien's unfortunate death and Hurricane Hugo delayed final decision in the case for several years.  In 1991, it was assigned to a visiting judge, who had been temporarily assigned to the District Court for the Virgin Islands.  The district court held a hearing to assess damages and on December 27, 1991, appointed a Special Master to "prepare a report with findings of fact and conclusions of law and [make] a

---

[1].  U&W has not appealed the portion of Judge O'Brien's order granting partial summary judgment to MMA.

[2].  Neither the parties nor the district court tell us whether those damages would be measured by the difference between the salvage price U&W received for the items it purchased during that thirty day period and its cost, or the prices it expected to receive from MMA.

recommendation for total damages to be awarded to [U&W]."  Jt.
App. at 10.

On August 20, 1992, the Special Master filed a report
recommending U&W receive damages of $27,790.19.  The Special
Master concluded that the "thirty day window" for damages ran
from June 20, 1984 to July 20, 1984.  The report stated that the
Special Master "view[ed] the scope of her review as being
strictly limited to the holdings of the late [Judge] O'Brien" and
therefore awarded damages only for inventory acquired during the
thirty-day window as the inventory U&W "could have . . .
returned"[3] within the thirty day window but for lack of fair
notice from MMA.  Jt. App. at 11-12, 17.  In setting U&W's
damages at a net of $27,790.19, the Special Master decided U&W
had not fully mitigated the loss that resulted from MMA's
July 20, 1984 cancellation of the contracts because U&W should
have immediately made greater efforts to reduce its inventory
than it had.

The Special Master found that U&W did make some
reduction in its purchases after July 20, 1984, that U&W knew it
would not need to maintain as large an inventory as it had before
that date and that this triggered its immediate duty to mitigate.
Perhaps the Special Master's most pointed conclusion on
mitigation was that U&W should have reduced its inventory to the

_____

[3].  The fact that MMA continued to purchase parts from U&W after
July of 1984, and as late as May of 1985 when the plant closed,
seems arguably inconsistent with the conclusion that U&W would
have ceased purchasing inventory during the thirty days prior to
the reduction.  See also infra note 12.

level it would have normally maintained absent its blanket contracts to supply MMA's requirements. Finally, the Special Master recommended that U&W receive prejudgment interest of 9% on the damages awarded from the date of cancellation, July 20, 1984, until payment.

Both U&W and MMA objected to the Special Master's Report. On April 12, 1993 the district court adopted the Special Master's Report and ordered MMA to pay damages to U&W in the amount of $27,790.19, but only awarded interest of $3.98 per day to U&W from July 20, 1992 to date.[4] U&W appealed this order on May 3, 1993. MMA filed its cross-appeal on May 11, 1993.

### III. Statement of Jurisdiction and Standard of Review

The district court had subject matter jurisdiction over this breach of contract action pursuant to V.I. Code Ann. tit. 4, § 32(a) (Supp. 1993). We have appellate jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 1993). The construction of an unambiguous contract is a matter of law for the court and therefore is subject to plenary review. Contract interpretation, as opposed to construction, involves mixed questions of law and fact. We exercise plenary review over questions of law and reverse findings of fact only if they are clearly erroneous. See Coca-Cola Bottling Co. of Elizabeth, Inc. v. Coca-Cola Co., 988 F.2d 386, 401 (3d Cir.), cert. denied, 114 S. Ct. 289 (1993).

---

[4]. The district court rejected the Special Master's prejudgment interest recommendation because she felt both sides had contributed to the long delay in this case.

When reviewing an order granting summary judgment, we view the facts in the light most favorable to the nonmoving party and decide whether any genuine issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(c); see Clark v. Modern Group Ltd., 9 F.3d 321, 326 (3d Cir. 1993).  An order granting summary judgment will be reversed if there is sufficient evidence for a jury to return a verdict in favor of the nonmoving party; however, if the evidence is merely colorable or not significantly probative, an order granting summary judgment should be affirmed. A disputed fact is material if it would affect the outcome of the lawsuit.  Id.

### IV.  The District Court Erred When It Rewrote the Parties' Contract in Favor of U&W

Under the UCC as adopted by the Virgin Islands, V.I. Code Ann. tit. 11A, § 1-203 (1987), and the Restatement (Second) of Contracts § 205 (1981),[5] all contracts impose an obligation of good faith and fair dealing in their performance and enforcement. See also Action Eng'r v. Martin Marietta Aluminum, 670 F.2d 456, 460 n.8 (3d Cir. 1982).  This obligation of good faith

---

[5].  The blanket contracts do not provide what local law is to govern their construction or interpretation.  The parties assume that the law of the Territory of the Virgin Islands applies. Because the contract was entered into and performed in the Virgin Islands by two corporations organized and existing under the laws of the Virgin Islands, we agree and will apply Virgin Islands law.  The Virgin Islands look to the Restatement for their common law.  V.I. Code Ann. tit. 1, § 4 (1984); see also St. Surin v. Virgin Islands Daily News, Inc., 21 F.3d 1309, 1315 n.5 (3d Cir. 1994).

incorporates honesty in fact as well as reasonable commercial standards of fair dealing.  See V.I. Code Ann. tit. 11A, § 1-201 (defining good faith); Restatement (Second) of Contracts § 205 cmt. a.  We have held that UCC section 1-203 imposes a general requirement of fundamental integrity in commercial transactions falling under the UCC.  Skeels v. Universal C.I.T. Credit Corp., 335 F.2d 846, 851 (3d Cir. 1964).  In this case, it is U&W's burden to prove that MMA acted in bad faith.  See Tigg Corp. v. Dow Corning Corp., 962 F.3d 1119, 1123 (3d Cir.), cert. dismissed, 113 S. Ct. 834 (1992); HML Corp. v. General Foods Corp., 365 F.2d 77, 83 (3d Cir. 1966);[6] see also V.I. Code Ann. tit. 11A, § 2-306.

Because of the risk U&W agreed to expose itself to under the blanket contracts by undertaking to maintain a parts inventory adequate to meet MMA's usual production requirements, the district court decided that the duty of good faith which U.C.C. § 1-203 implies required it to add a notice term otherwise "missing" from the contract.  We disagree.  The implied duty of good faith and fair dealing in commercial contracts that section 1-203 imposes controls the manner in which the contracting parties carry out the obligations they have undertaken in a

_____

[6].  In Tigg we noted two different theories by which a court may decide who should bear the burden of proving bad faith:  the case law approach, implying the burden should be placed on seller, and the commentator approach, favoring placing the burden on whoever is to benefit from a showing of bad faith.  Tigg Corp., 962 F.2d at 1123-24.  In HML Corp., we simply placed the burden on the plaintiff.  HML Corp., 365 F.2d at 83.  Here, under either theory, U&W is the appropriate party on which to place the burden.

contract; it does not give a court the power to impose additional obligations on one contracting party because a court concludes it is unfair to have the other shoulder a market risk that the former expressly bargained to avoid and the other expressly agreed to assume.

The district court relied on Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir. 1984), and KLT Industries, Inc. v. Eaton Corp., 505 F. Supp. 1072 (E.D. Mich. 1981) to reach its conclusion that the duty to act in good faith necessitated MMA's giving notice to U&W. Tymshare was a breach of contract action brought by a salesman against his former employer. The salesman alleged the employer breached the implied contractual duty of acting in good faith when it altered sales quotas in such a way as to deprive the plaintiff of previously earned commissions. Then-Judge Scalia noted that "the doctrine of good faith performance is a means of finding within a contract an implied obligation not to engage in the particular form of conduct which . . . constitutes 'bad faith.'" Tymshare, 727 F.3d at 1152. The court then noted that "the object of our inquiry is whether it was reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power to adjust quotas could not be employed. If not, then [the employer] is correct that no action in this regard could constitute 'bad faith'--or, as we would put it, there is no implicit contractual restriction." Id. at 1153. The court stated that the implied covenant of good faith does not countermand acts specifically authorized, id. (quoting VTR, Inc.

v. Goodyear Tire & Rubber Co., 303 F. Supp. 773, 778 (S.D.N.Y. 1969), nor should it be permitted to dictate an outcome contrary to the intent of the parties. Id. (quoting MacDougald Constr. Co. v. State Highway Dep't, 188 S.E.2d 405 (Ga. 1972)). But, as the court in Tymshare noted, "the trick is to tell when a contract has been so drawn." Id. (emphasis in original).

KLT Industries provides one example of how a duty to notify may be included in the generalized obligation to act in good faith. In that case, two parties entered into an agreement where the plaintiff would design and fabricate six highly specialized test stands to be used by the defendant in testing and adjusting cruise control devices. Although the plaintiff did not perform on time, the defendant did not object and plaintiff continued on in the design and fabrication of the parts. Then the defendant, without notice, canceled the contract without giving the plaintiff an opportunity to demonstrate it could complete the contract. The court held that termination without notification violated the duty to act in good faith:

> The good faith obligation imposed by the UCC requires reasonable notification before termination to avoid surprise, protect good faith judgment and reduce uncertainty. Under the circumstances here [defendant's] conduct led [plaintiff] to reasonably believe it would have the opportunity to perform under the contract. At least [plaintiff] was entitled to the opportunity to demonstrate to [defendant] it could perform under the contract within the time frame contemplated . . . .

KLT Indus., 505 F. Supp. at 1079-80.  Thus, where the defendant permitted the plaintiff to continue a specialized contract and failed to object to a performance that did not strictly conform to the agreement, the defendant was required to give some notice of its intention to cancel the contract.

Neither of these cases stands for the proposition that a party invariably has a good faith obligation to notify a supplier before reducing, altering or canceling an agreement. Instead, they merely acknowledge certain circumstances in which a general implied obligation to act in good faith will command or prohibit acts not specifically delineated in the agreement.  But, as Tymshare recognized, the language of the agreement and expressed intent of the parties always guide the application of the implied duty of good faith.

Here, MMA did not act in bad faith when it reduced or canceled some of the individual purchase orders issued under the contracts.  When MMA sent U&W the individual purchase order reductions in July or August of 1984, it did so under section 18(a) of the contract.  That section required no prior notice of such reductions but made MMA liable to pay U&W only "for materials committed to the manufacture of PRODUCT ordered hereunder prior to the time of such cancellation."  Jt. App. at 248.[7]  The district court incorrectly treated MMA's decision to reduce its own inventory as a change in MMA's requirements.

---

[7]. U&W does not contend that MMA owes it any money for materials committed at the time of these cancellations and/or reductions.

Although MMA decided to reduce its individual purchase orders because it wanted to reduce its own inventory and use up stocks on hand, it continued to maintain normal production and accordingly continued to place individual purchase orders with U&W as necessary to meet its usual production requirements until it closed its plant in May 1985.  The blanket contracts were not canceled by MMA's actions because MMA continued to order parts from U&W and U&W continued to supply parts to MMA to meet MMA's normal production levels, in accordance with the blanket contracts.  See infra note 12.

Despite MMA's additional reliance on U&W for parts that resulted from MMA's decision to reduce its own inventory, MMA told U&W not to order certain additional parts until MMA told U&W it needed them and never objected to U&W's decision to reduce its own inventory of some of the parts it had agreed to supply to MMA.  Indeed, with MMA's knowledge and implicit approval, U&W thereafter curtailed its own orders from its suppliers and delayed placing them until absolutely necessary to meet MMA's continuing requirements.  In fact, this caused U&W's inventory of the parts it had agreed to supply to MMA to fall below that which would have been required to meet the estimated production levels MMA continued to maintain, thus putting U&W itself in technical breach of its express obligation to maintain an inventory adequate to meet MMA's unchanged production requirements.[8]  MMA

----

[8].  This is consistent with Knorr's testimony that he understood "if [U&W didn't] have the quantities on hand even up to the end of the agreement[,] the agreement can be terminated."  Jt. App. at 311.

not only acquiesced in this, it told U&W not to order certain additional parts unless advised otherwise.[9] In order to help U&W reduce its inventory, U&W's Knorr testified MMA also extended delivery times on orders for items U&W still had on its shelves.

MMA's previously specified production levels were the guide the blanket order agreement required U&W to use in deciding how many parts it had to keep on hand to meet its obligations under the blanket contracts. Paragraph 19 of the blanket contract required MMA to give U&W notice of changes in its production level because MMA's production level was the basis for U&W's inventory levels. See Jt. Ap. at 248. Ross testified MMA's production levels and its commensurate needs did not change until shortly prior to the plant's closing on May 12, 1985, and there is no other evidence in the record showing that MMA decreased its production levels between July of 1984 and May of 1985.[10]

Under the blanket contracts, MMA was not obligated to buy any product from U&W beyond placing one initial order within ninety days of entering into each contract. U&W expressly agreed to bear the market risk of disposing of unneeded inventory it had

_____

[9]. We note, however, that the court did correctly grant summary judgment to MMA on the two blanket contracts under which MMA had advised U&W not to order additional parts.

[10]. Knorr did testify that he noticed a decrease in MMA's production levels during the first quarter of 1984, (App. at 317) but U&W does not claim any damages resulted from this reduction. Although U&W alleges it was harmed by a decrease in MMA's production levels in July of 1984, there is no evidence supporting U&W's allegation that MMA's production decreased between July 1984 and May 1985 when the plant closed.

purchased to meet MMA's normal requirements when its contract with MMA was terminated.  See Jt. App. at 248.

This unrebutted evidence contradicts any implicit finding the district court may have made that MMA dealt unfairly, dishonestly or unreasonably with U&W.[11]  Thus, U&W, the moving party on its motion for partial summary judgment, has failed to produce evidence from which it could be inferred that MMA acted in bad faith.  See HML Corp., 365 F.2d at 83.

U&W took a calculated business risk when it agreed to supply MMA with parts as needed.  It accepted the risk that it would have to dispose of unused inventory if MMA canceled the contract or went out of business.  This risk is inherent in requirements contracts.  The contract did not oblige MMA to make any more than one order, let alone notify U&W if it would not be placing its usual amount of purchase orders.

It is indeed unfortunate that U&W was unable to return the parts it had on hand when MMA terminated the contract in May of 1985, but this is a risk it assumed when it agreed to supply MMA's requirements on MMA's terms.[12]  In a requirements contract,

_____

[11].  The district court stated that "MMA's unbridled discretion [to expose U&W to great risk in requiring it to keep the same inventory even though  MMA had decreased its own] requires a corresponding duty to act in good faith."  Jt. App. at 209. Thus, it implied a notice provision because "a good faith performance required advanced notice."  Id.  The court never expressly found that MMA acted in bad faith but that finding is implicit in its decision to add a second notice requirement into the blanket order agreements.

[12].  U&W co-owner John McCallum ("McCallum") testified he did not try to return any of his stock when he received the reduction and/or cancellation orders from MMA because he did not believe the contracts were terminated by MMA's actions.  He testified

"[t]he seller assumes the risk of all good faith variations in the buyer's requirements, even to the extent of a determination to discontinue the business." Welded Tube Co. of Am. v. Phoenix Steel Corp., 377 F. Supp. 74, 79 (E.D. Pa. 1974), aff'd in relevant part, 512 F.2d 342 (3d Cir. 1975); see also HML Corp., 365 F.2d at 81. MMA did not breach its contract with U&W or contravene its duty to act in good faith in May of 1985, when it closed its Virgin Islands bauxite plant, or in July of 1984, when it notified U&W it planned to reduce its own inventories while maintaining pre-existing production levels. See Welded Tube Co., 377 F. Supp. at 79.[13]

## V. Conclusion

The order of the district court granting partial summary judgment to U&W and its order denying MMA's motion for summary judgment will be reversed and the case will be remanded to it with instructions to enter judgment for MMA.

(..continued)
that had he attempted to return his stock at that time, his suppliers would have accepted approximately 80-85% of it in returns. When U&W attempted to return parts to its suppliers after the plant closed in May of 1985, the suppliers refused to accept U&W's returns. U&W believes they did so because they no longer considered U&W a good customer based on U&W's lack of recent orders and rumors concerning MMA's plant closing.

[13]. Because of our disposition of the case, we do not reach U&W's argument that the district court erred in reducing its damages because it had not met its duty to mitigate.