772 F.2d 906
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
GODCHAUX-HENDERSON SUGAR CO., INC. QWS INTERNATIONAL TRADING
CO., PLAINTIFFS-APPELLEES,
v.
DR. PEPPER-PEPSI COLA BOTTLING COMPANY OF DYERSBURG, INC.,
DEFENDANT-APPELLANT.
 NO. 83-5730
 United States Court of Appeals, Sixth Circuit.
 8/29/85
 
 W.D.Tenn.
 VACATED AND REMANDED
 On Appeal from the United States District Court for the Western District of Tennessee
 Before: ENGEL and MERRITT, Circuit Judges; and SPIEGEL,* District Judge.
 ENGEL, Circuit Judge.
 
 
 1
 Few events in American business life are so likely to make enemies of erstwhile business friends and colleagues as sudden and unexpected changes in market conditions. The appeal in this Tennessee diversity case involves, as the district judge expressed it, 'an honest to goodness contract dispute between obviously excellent businessmen.'
 
 
 2
 The dispute concerns two contracts for the purchase of sugar by Dr. Pepper-Pepsi Cola Bottling Company of Dyersburg, Inc. (Dr. Pepper), as the purchaser, and Godchaux-Henderson Sugar Co., Inc. (Godchaux), as supplier of the sugar.
 
 
 3
 Dr. Pepper belongs to a cooperative organization of bottling companies known as Miss-Ark-Tenn (the Co-op), which performs various services for its member bottlers, including negotiating sugar purchases. In 1974 or 1975, the Co-op and its individual member bottlers began purchasing sugar from Godchaux.
 
 
 4
 Customarily, Godchaux's broker would contact the Co-op's general manager with an offer to sell sugar at a specified price. After deciding whether to buy for the Co-op at the offering price, the general manager would contact the member bottlers to determine which of them wanted to purchase sugar at the offering price for their individual needs. The general manager then would inform Godchanux's broker which bottlers had agreed to purchase. Godchaux would send each purchaser a written contract setting forth the agreed price, the contract period, and a specific quantity of sugar to be purchased. The purchasers usually would sign the written contract and return a copy to Godchaux; however, even when the purchasers failed to sign and return the contract, both parties would perform their obligations under the agreement.
 
 
 5
 Although the written contracts often covered more than one quarter of a year, the prices usually were set by quarters. Therefore, contracts covering more than one quarter often contained more than one price term. The quantity terms listed in the contracts were determined unilaterally by Godchaux based upon the amount of sugar purchased by the bottler during the same quarter of the preceeding year. Although the bottlers knew how these quantity terms were calculated, neither they nor Godchaux paid much attention to the listed amounts in actual practice.[1] For example, from the fourth quarter of 1978 through the second quarter of 1980, Dr. Pepper three times purchased less and four times purchased more than the contract amount for the particular quarter.[2] The bottlers would order sugar from Godchaux against their contracts as needed, usually over the telephone.
 
 
 6
 All went well until the autumn of 1980. At a meeting in October 1980, representatives of Godchaux told members of the Co-op that they expected sugar prices to rise sharply soon and suggested that the members 'book' their sugar needs for the first and second quarters of 1981 at then existing prices. After the meeting, the Co-op decided to book one-half of its sugar requirements with Godchaux for the first quarter of 1981. Don Adams, the general manager of the Co-op, contacted W. E. Burks, president of Dr. Pepper, and Burks also agreed to book one-half of Dr. Pepper's first quarter needs with Godchaux at that time. Burks later received a written contract numbered 1598, which he signed and returned to Godchaux. The contract price was $48.50 per hundredweight (cwt.), and because to a clerical error the quantity listed was 1750 cwt. although it should have been 750 cwt.[3]
 
 
 7
 Approximately two weeks later, Adams notified Burks that the Co-op had decided to book at that time the remainder of its first quarter needs at $45.80 per cwt. and all of its second quarter needs at $46.65 per cwt. Burks agreed to have Dr. Pepper's needs booked the same way. This agreement was memorialized in a written contract numbered 1634, which Godchaux sent to Dr. Pepper. The quantities listed were 700 cwt. for the first quarter and 2000 cwt. for the second quarter. No one at Dr. Pepper signed or returned a copy of this contract to Godchaux.[4]
 
 
 8
 In December 1980, sugar prices fell sharply. Dr. Pepper made some attempt to renegotiate the contract prices with Godchaux. However, at a meeting in March, 1981, a vice president of Godchaux informed the members of the Co-op that Godchaux would not renegotiate the prices. He also told the bottlers that Godchaux intended to treat the quantity terms as minimum requirements, contrary to the earlier dealings between the parties.
 
 
 9
 Dr. Pepper subsequently refused to purchase any sugar from Godchaux during the first two quarters of 1981. Instead, it used surplus sugar that it had in inventory during the first quarter and purchased 1400 cwt. from a different supplier during the second quarter.
 
 
 10
 Godchaux brought a diversity action in the United States District Court for the Western District of Tennessee seeking damages for the breach of both contracts. Following trial, the district judge entered judgment for Godchaux, reformed the quantity term of contract No. 1598 to reflect the correct amount, and awarded damages for the full quantities in both contracts and attorney fees as provided in the contracts.
 
 
 11
 Dr. Pepper appeals.
 
 
 12
 While we generally agree with the findings of fact and conclusions of law of the district judge, we are bound, from an examination of the record, to conclude that his finding that the agreements in question were not requirements or needs contracts are clearly erroneous and inconsistent with his other supported findings of fact. We accordingly modify the findings of the district court and the determination of damages flowing therefrom and, as modified, affirm the judgment. Since this is an unpublished opinion, we refer the parties to the extensive findings of fact and conclusions of law rendered by the trial court in its Supplemental Findings of Fact and Conclusions of Law [hereinafter cited as Supplemental Findings], filed on September 21, 1983. Our opinion must be understood in the light of those findings, which we accept other than the determinations relating to the nature of the contracts, which we find to be clearly erroneous and inconsistent with the balance of the trial judge's findings.
 
 
 13
 In its appeal, Dr. Pepper correctly points out the inconsistencies in the trial judge's opinion. Dr. Pepper contends that the course of dealing between the parties established that the contracts were in fact good-faith requirements or needs contracts. The district court in fact found that the parties had not adhered to the quantity terms in earlier contracts:
 
 
 14
 The preponderance of the evidence on this issue is that the quantities stated in the contract did not mean anything. Over several years of business dealings between the parties, the numbers were never noticed or even adhered to. The substantial evidence is that the custom, practice and course of business dealings between the parties was that the buyer would order sugar on the contract as needed regardless of the quantities stated in the contract.
 
 
 15
 Supplemental Findings at 5. Notwithstanding these findings, the district court still held that Contracts 1598 and 1634 were not requirement contracts:
 
 
 16
 The preponderance of the evidence in this case is that the quantities stated in both contracts were based upon sugar needs and usages for the same quarters of the prior year. The practice of establishing a quantity term based upon prior needs, consistently followed by the contracting parties, is a specific and definite measure of quantity and should be followed here. If the analysis of the proof is correct, and the Court thinks that it is, then the quantity terms specified in Contracts 1598 and 1634 should be ruled valid and binding upon Dr. Pepper.
 
 
 17
 Id. at 25.
 
 
 18
 We find the two determinations of the court internally inconsistent and are left with the problem of resolving the inconsistency upon the basis of Tennessee's Uniform Commercial Code.
 
 
 19
 Under the U.C.C., as adopted in Tennessee, an established course of dealing between the parties supplements or qualifies the express terms of an agreement. Tenn. Code Ann. Sec. 47-2-202 provides:
 
 
 20
 Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
 
 
 21
 (a) by course of dealing or usage of trade (Sec. 47-1-205) or by course of performance (Sec. 47-2-208) . . ..
 
 
 22
 Section 47-1-205(1) defines course of dealing:
 
 
 23
 (1) A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.
 
 
 24
 Subsections (3) and (4) of section 47-1-205 further provide:
 
 
 25
 (3) A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement.
 
 
 26
 (4) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade.
 
 
 27
 The official comment to section 47-2-202 explains:
 
 
 28
 (2) Paragraph (a) makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. Such writings are to be read on the assumption that the course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used. Similarly, the course of actual performance by the parties is considered the best indication of what they intended the writing to mean.
 
 
 29
 While Tennessee law has not expressly addressed the question, courts interpreting identical U.C.C. provisions in other states have held that the meaning of specific quantity terms in written contracts should be interpreted in the light of the parties' course of dealing. For example, in Columbia Nitrogen Corp. v. Royster Co., 451 F.2d 3 (4th Cir. 1971), the court held that extrinsic evidence of course of dealing and usage of trade was admissible to show that express quantity terms in contracts for materials in the mixed fertilizer industry were mere projections to be adjusted according to needs. The court there ruled that under U.C.C. Sec. 2-202, no finding of ambiguity in the writing was necessary to admit extrinsic evidence about the usage of trade and the parties' course of dealing. Further, the court found that the extrinsic evidence could reasonably be construed consistently with the express terms of the contract because (1) the contract did not expressly prohibit reference to courses of dealing and usages of trade and (2) the contract was silent about adjusting quantities to reflect a declining market. Further, the court found that the contract description of the quantity terms was consistent with the extrinsic evidence and, lastly, that the default clause of the contract referred only to the buyer's failure to pay for delivered phosphate and, in fact, stated no consequence for refusal to take delivery.
 
 
 30
 Likewise, in Campbell v. Hostetter Farms, Inc., 251 Pa. Super, 232, 380 A.2d 463 (1977), a Pennsylvania appellate court held that extrinsic evidence of course of dealing was admissible to show that the specific quantity terms in a contract for a farmer's sale of grain were simply shorthand methods of stating the estimated yields of the farmer's fields. Again, the court held that ambiguity in the wording of the contract was not a prerequisite to admissibility of the extrinsic evidence. Accordingly, it upheld a jury verdict for the farmer.
 
 
 31
 The trial judge's determination in the instant case that the quantity terms 'were never noticed or even adhered to' between the parties finds solid support in the record. Both parties recognize that under Tenn. Code Ann. Sec. 47-2-202, the express language of the contracts must be interpreted in light of the established course of dealing. Having examined the record closely, we are at a loss to understand the trial judge's conclusion that the contracts were not requirement contracts. He apparently based that conclusion upon the fact that the written quantity terms were specific and had been calculated by a method of which both parties were aware. However, even though the amounts stated are specific and definite, no language in either contract states what purpose the quantity terms served. In this situation, we believe the practice of the parties supplies the proper answer, that is that the quantity terms were placed in the contract to evidence the parties' general estimate of the amounts Godchaux should be expected to have available for Dr. Pepper's needs, at the price stipulated. Of course, there are other possible explanations. For example, the amounts could be construed as the minimum or maximum the parties agreed to buy or sell. However, we find that the only explanation consistent with the course of dealing is that the quantity terms were estimates of Dr. Pepper's needs and the amount Godchaux would be expected to supply. In short, we conclude that upon the undisputed facts Contracts 1598 and 1634 were requirements contracts notwithstanding the holding of the trial judge to the contrary. The question then becomes how such a finding affects the ultimate determination of damages and liability.[5]
 
 
 32
 Dr. Pepper has argued that the announcement by Godchaux that it would require the bottlers to purchase the full amounts listed in their contracts amounted to anticipatory repudiation of the contracts, excusing performance on the part of Dr. Pepper. The trial judge agreed that Godchaux's announcement constituted a substantial change in policy. However, he held, and we agree, that this conduct did not amount to such a repudiation of the contract as to warrant Dr. Pepper's concluding that it could cancel its otherwise required performance on the basis of Tenn. Code Ann. Sec. 47-2-610.[6] Although Godchaux did inform the members of the Co-op that it expected them to 'pull' the quantities of sugar listed in their contracts, the district court found no evidence suggesting that Godchaux had indicated an intention not to sell any sugar if the stated quantities were not purchased. The authorities cited by Dr. Pepper, Jon-T Farms, Inc. v. Goodpasture, Inc., 554 S.W. 2d 743 (Tex. Civ. App. 1977) and Unique Systems, Inc. v. Zotos International, Inc., 28 U.C.C. 1340 (8th Cir. 1980), do not support the theory of anticipatory repudiation under the facts here. In each of the cited cases, the repudiating party manifested a clear intention not to perform unless the other party fulfilled some condition beyond the obligations of the contract. As the district judge found, there was no evidence here that Godchaux intended not to perform.
 
 
 33
 Much discussion has been focused upon whether Contract 1634 was in fact a written or an oral contract. The evidence is undisputed that Contract 1634 never was signed by an officer of Dr. Pepper or returned to Godchaux. Paragraph 18 of Contract 1634 provides:
 
 
 34
 This contract is written confirmation of an agreement reached by the parties on 11-18-80 and unless it is signed by the Buyer and returned to Godchaux within 15 days of said date the agreement shall be deemed breached by Buyer and automatically terminated. In such event, Godchaux shall retain all rights of damage it may have.
 
 
 35
 In view of this language, Dr. Pepper makes two arguments with respect to the enforceability of Contract 1634. First, it argues that the contract was never formed because it did not sign and return the written agreement within fifteen days. The district court found that Contract 1634 was enforceable either as an oral contract admitted by Dr. Pepper or as a written confirmation of an oral agreement. As the trial judge observed, Mr. Burks fully acknowledged his understanding that he had agreed to purchase the remainder of Dr. Pepper's first quarter needs and all of its second quarter needs at the prices set forth in the written agreement. He also testified that he was not concerned whether he received a written copy of the agreement because when he needed sugar, he ordered it. Supplemental Findings at 9. The evidence showed that both parties had performed on at least one earlier contract even though it was never signed by a representative of Dr. Pepper. Under these circumstances, we believe that the parties did not consider the signing and returning of the written confirmation a prerequisite to forming a valid contract.
 
 
 36
 We likewise reject Dr. Pepper's claim that any contract evidenced by the written confirmation terminated automatically under paragraph 18 when Dr. Pepper failed to sign and return the document. Neither party had paid any attention to the 'automatic termination' provisions of the clause in the past. Rather, they had proceeded to act in accordance with the contract regardless of whether it was signed or not. Specifically, the trial court noted that both parties had performed on Contract 9795, even though that contract, like 1634, never had been signed by a representative of Dr. Pepper.
 
 
 37
 We now turn to the scope of Dr. Pepper's liability on the contracts. The district court held that even if the contracts were interpreted as requirements contracts, Dr. Pepper would be liable for the entire reformed quantity in Contract 1598 and the entire listed quantity in Contract 1634 'because Dr. Pepper did have some needs.' Supplemental Findings at 24. The court expressly found its conclusion to be consistent with Tenn. Code Ann. Sec. 47-2-306(1), which provides:
 
 
 38
 47-2-306. Output, requirements and exclusive dealings.--(1) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
 
 
 39
 Godchaux argues that under this statute, Dr. Pepper must be held liable for the written amounts because Dr. Pepper's actual purchases during the contract period were unreasonably disproportionate to the stated estimates.
 
 
 40
 Notwithstanding the district court's analysis, the majority of authorities have construed U.C.C. Sec. 2-306(1) as permitting good faith reductions in requirements, as opposed to increases, even though the reductions may be highly disproportionate to stated estimates. See, e.g., Angelica Uniform Group, Inc. v. Ponderosa Systems, Inc., 636 F.2d 232 (8th Cir. 1980); R. A. Weaver and Associates, Inc. v. Asphalt Construction, Inc., 587 F.2d 1315, 1321-22 (D.C. Cir. 1978); R. Anderson, 2 Anderson on the Uniform Commercial Code 524 (3d ed. 1982); J. White & R. Summers, Uniform Commercial Code 126-27 (2d ed. 1980). The cases relied upon by Godchaux are distinguishable because they all involve disproportionate increases in requirements.
 
 
 41
 The undisputed proof reveals that Dr. Pepper purchased no sugar during the first quarter of 1981. Instead, it used up a surplus of sugar that it had acquired earlier from Godchaux. During the second quarter of 1981, Dr. Pepper purchased 1400 cwt. from a different supplier because it was able to obtain a more favorable rate. To the extent that Dr. Pepper purchased from a different supplier, it breached its contract with Godchaux. However, because there was no evidence of bad faith in the reduction of requirements, Dr. Pepper is liable for the difference between the contract price and the market price of only the sugar that it actually purchased. Therefore, we find that Dr. Pepper did not breach Contract 1598, and we reduce the damages on Contract 1634 to $33,236.[7]
 
 
 42
 Finally, Dr. Pepper contends that Godchaux is not entitled to attorneys' fees under either contract. Dr. Pepper argues that no attorneys' fees may be awarded under Contract 1598 because it did not breach that contract. We agree with Dr. Pepper on this point and reverse the award of attorneys' fees under Contract 1598.
 
 
 43
 With respect to Contract 1634, Dr. Pepper claims that no attorneys' fees may be awarded because there was no signed, written agreement to that effect. Although under Tennessee law attorneys' fees may not be awarded to prevailing parties in civil litigation absent a contract, statute, or recognized ground of equity providing for attorneys' fees, State v. Thomas, 585 S.W. 2d 606 (Tenn. 1979), we find no Tennessee authority holding that a contract providing for attorneys' fees must be written to be enforceable. On this account, we think that the trial judge did not err in honoring the language that was generally incorporated into the written agreements between the parties. Although Dr. Pepper has not challenged the reasonableness of the fees or the fact that they were incurred, in view of our disposition of the case, there may be some question about the appropriate amount to be awarded. Although we could remand this question to the district court, it appears the better part of discretion to reduce the attorneys' fees with respect to Contract 1634 in proportion to the reduction of damages for the breach of that contract. According to our calculations, that would reduce the award of fees on Contract 1634 from $18,013 to $10,040. This is an inexpert means of adjustment, but clearly the amount of the fee would normally be influenced by the extent of success in recovery of damages. Thus, to the extent that Godchaux' recovery under Contract 1634 has been reduced, it does not seem unreasonable to make a proportionate reduction of the attorneys' fees awarded by the trial judge as well.
 
 
 44
 Accordingly we VACATE the judgment of the district court and REMAND the case with directions to enter judgment in accordance with this opinion. Although, we recommend the foregoing calculation of attorneys' fees, we leave it to the good discretion of the trial judge to reopen that determination should he decide, on motion of either party, that some other figure is reasonable under the circumstances. Costs are awarded to the appellant.
 
 
 
 [1]
 Godchaux contends that the quantity terms were important so that it would know how much sugar to order from its suppliers. However, it does not contest the district court's finding that between the parties 'the numbers were never noticed or even adhered to.'
 
 
 [2]
 Although Dr. Pepper at times had purchased less than the contract amount for a particular quarter, until this dispute arose it always had purchased more than the aggregate contract amount during the period covered by each contract. Jt. App. at 147
 
 
 [3]
 Dr. Pepper had purchased 1500 cwt. during the first quarter of 1980. The district court corrected this clerical error by reforming the quantity term to one-half that amount (750 cwt.). Godchaux does not contest this reformation on appeal
 
 
 [4]
 Burks testified that he never saw a copy of the contract personally. However, the district court found that the contract had been sent
 
 
 [5]
 In view of our conclusion that the contracts were requirements contracts, we find it unnecessary to decide any question of estoppel or of waiver. We therefore agree with the trial judge that these issues do not affect the decision in this case
 
 
 [6]
 That section provides:
 47-2-610. Anticipatory repudiation.--When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may:
 (a) for a commercially reasonable time await performance by the repudiating party; or
 (b) resort to any remedy for breach (Sec. 47-2-703 or Sec. 47-2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
 (c) in either case suspend his own performance or proceed in accordance with the provisions of this chapter on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Sec. 47-2-704).
 
 
 [7]
 Neither party contests the accuracy of the price figures apparently used by the district court. The difference in prices for the second quarter of 1981 was $23.74 per cwt. 1400 X $23.74 = $33,236.00