FIRST DIVISION 

FEBRUARY 26, 2001

No. 1-98-4840

SCHAWK, INC., )

) 

Plaintiff-Appellant, ) Appeal from the

   ) Circuit Court of

) Cook County.

)

v. ) No. 95 L 9623 

)

DONRUSS TRADING CARDS, INC., ) Honorable

) David G. Lichtenstein,

Defendant-Appellee. ) Judge Presiding

)

JUSTICE TULLY delivered the opinion of the court: 

This case concerns the parameters of a buyer's duty of good faith under a requirements contract. 

Plaintiff, Schawk, Inc., is an Illinois corporation that provides graphic arts services and prepares artwork for printing.  Defendant, Donruss Trading Cards, Inc., was a corporation that manufactured and sold sports trading cards under licenses from professional sports organizations.  In 1994, plaintiff and defendant entered into a contract whereby defendant agreed to purchase from plaintiff all prepress art services it required to print its trading cards, for a period of five years, commencing January 1, 1995.  In 1995, defendant purchased all prepress services from plaintiff, in conformance with the contract.  In May 1996, however, after informing plaintiff of its intentions, defendant sold substantially all of its licenses and assets to Pinnacle Brands, Inc. (Pinnacle), thereby effectively ending its trading card business and its need for any prepress services.  Thereafter, plaintiff brought an action for breach of contract, alleging defendant breached its duty of good faith by failing to purchase prepress services from plaintiff after May 1996, by selling its trading card business to Pinnacle without obtaining Pinnacle's agreement to assume the contract, and by failing to remain in business for the duration of the contract.  Defendant filed a motion for summary judgment, arguing it was entitled to judgment because plaintiff could not demonstrate defendant acted in bad faith.  In support of its motion, defendant presented sales records and the affidavit and deposition of its president, demonstrating that defendant and the sports card industry suffered severe declines in sales between 1991 and 1995, and defendant's decision to sell its assets to Pinnacle was solely for purposes of curtailing these losses. The trial court granted defendant's motion for summary judgment, finding the record devoid of any evidence that defendant acted other than in good faith under the contract.  From that order, plaintiff now appeals, arguing the trial court erred in entering summary judgment because: (1) defendant had a duty to remain in business for the duration of the contract and (2) there was evidence to suggest that defendant terminated its business in bad faith. 
 This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 and 303 (155 Ill. 2d Rs. 301, 303).
 
 
We affirm for the following reasons.

Background 

The record in this case reveals the following facts.  In 1990, defendant began purchasing prepress services from plaintiff in connection with the printing of its trading cards.  In 1991, defendant's net sales totaled $134 million.  In 1992, however, defendant experienced a decline in sales, its net sales dropping to $127 million.  For the next two years, defendant and the entire trading card industry continued to experience declining sales; in 1993, defendant's net sales totaled $ 77 million; in 1994, its net sales totaled $68,400,000.  In spite of these declines, defendant purchased more than $4 million in services from plaintiff in both 1993 and 1994.

In August 1994, Leaf, Inc., the company that owned defendant and that in turn was owned by the parent corporation, Huhtamaki Oy of Finland, began negotiations with plaintiff for a contract, under which plaintiff would become the exclusive provider of prepress services to defendant. On October 1, 1994, plaintiff and defendant entered into a contract which provided in part:

"1.01   For a period of five years beginning January 1, 1995, Donruss agrees to purchase from Schawk and Schawk agrees to sell to Donruss, 100 percent (100%) of Donruss' requirements for prepress services.

* * *

 6.02    This Agreement shall be binding upon the parties and their successors and permitted assigns. The parties to this Agreement may not assign their respective rights and obligations hereunder to any other person or entity without the prior written consent of the other parties which shall not be unreasonably withheld."

 

Section 4.01 of the contract additionally set forth a payment schedule, pursuant to which  plaintiff agreed to accept 10% of the payment due to it in the form of trade credits, instead of cash, if defendant purchased a minimum amount of services from plaintiff in a given year. Under the terms of this section, if defendant did not purchase a base amount of services in a given year, then plaintiff was entitled to exchange any trade credits it received from defendant that year for cash.  Similarly, if defendant purchased more than the base amount of services in a given year but less than $4 million, plaintiff was entitled to exchange 50% of the trade credits it received that year for cash.  The base amount of services required to trigger partial payment in trade credits in 1995 was listed as $3 million. The base amounts listed for the remaining years under the contract gradually increased, reaching $3,750,000 in 1999.
  

In 1995, defendant purchased all prepress services from plaintiff, in accordance with the contract, which amounted to more than $5 million in services.  Defendant suffered another serious sales decline in 1995, however, as did the rest of the sports trading card industry.  Defendant's net sales in 1995 totaled $47 million, representing a loss of more than $7 million to defendant.  In evaluating this loss, defendant determined that its declining sales were attributable, in part, to the closure of numerous hobby stores and a stagnating collector population.  Defendant also determined 
its profit margins were burdened by the fixed nature of prepress expenses on such considerably reduced sales quantities. Although defendant estimated that its net sales could increase in 1996 to $69,800,000, i
n view of its continuing losses, and the volatility of the trading card industry, it concluded it could not profitably compete in the trading card business.

 At first, defendant entertained several proposals from companies seeking to engage in a joint venture in the trading card business, but it ultimately 
determined that getting out of the trading card business altogether
 was the best response to its losses.  In reaching this conclusion, defendant took into account the economic strategy of its parent company,
 Huhtamaki Oy,
 which
 had decided to concentrate on its confectionary and food packaging businesses.
 As defendant's parent company,  Huhtamaki Oy had the resources and borrowing power to make an investment of up to $60 million, which in theory, it
 could have invested in defendant's enterprise.
 

Defendant initially also tried to sell its entire business to Pinnacle through a stock exchange, which would have included the prepress services contract with plaintiff, but Pinnacle was only interested in acquiring defendant's licensing and trademark assets.  Defendant, however, did not offer Pinnacle added consideration as inducement to assume the prepress services contract.

On May 17, 1996, defendant notified plaintiff in writing that it was entering into an agreement with Pinnacle, pursuant to which defendant would sell a substantial portion of its licensing-related assets.  Defendant informed plaintiff that Pinnacle was not interested in acquiring the prepress services contract with plaintiff, and the contract therefore would not be transferred to or assumed by Pinnacle.  Nevertheless, defendant assured plaintiff that to the extent it continued to have requirements for prepress services that would fall under the contract with plaintiff, it would continue to utilize plaintiff for those services.   

   On May 29, 1996, defendant sold most of its inventory, trademarks, and licenses to manufacture and sell sports cards to Pinnacle, for $32,500,000.  Following the sale, Pinnacle continued to produce sports trading cards under defendant's name, and some of defendant's former employees went to work for Pinnacle.  Defendant's sale of its assets to Pinnacle essentially eliminated its requirements for prepress services, and defendant did not purchase any more services from plaintiff after May 29, 1996, although four years remained on the contract.  On August 16, 1996, plaintiff filed the instant action for breach of contract. 

Discussion 

 As previously stated, this case comes to us on appeal from the
 trial court's order granting summary judgment in favor of defendant. The standards for determining the propriety of an order of summary judgment are well settled.  Summary judgment is properly granted if the pleadings, depositions, admissions, and affidavits on file show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. 735 ILCS 5/2-1005(c) (West 1996).
  A court must construe the evidence strictly against the movant and liberally in favor of the nonmoving party.  
Colonial Inn Motor Lodge, Inc. v. Gay
, 288 Ill. App. 3d 32, 39 (1997).  
If reasonable persons could draw divergent inferences from the undisputed material facts or where a dispute exists as to a material fact, summary judgment should be denied and the issue decided by the trier of fact.  
Koziol v. Hayden
, 
309 Ill. App. 3d 472, 476 (1999).
 
 Appellate review of a trial court's order granting summary judgment is 
de novo
. 
Chandler v. Doherty
,
 299 Ill. App. 3d 797, 801 (1998).

Plaintiff initially asserts that the trial court's entry of summary judgment was erroneous because, 
under Illinois law, a buyer has a duty to remain in business for the duration of a requirements contract, and defendant breached that duty by selling its assets to Pinnacle.
 
 In support of this proposition, plaintiff cites to three early Illinois cases, 
Chalmers & Williams v. Walter Bledsoe & Co.
, 218 Ill. App. 363 (1920), 
Minnesota Lumber Co. v. Whitebreast Coal Co.
, 160 Ill. 85 (1895), and  
National Furnace Co. v. Keystone Manufacturing Co.
, 110 Ill. 427 (1884), as well as the more recent decision, 
M.I.G. Investments, Inc. v. Marsala
, 92 Ill. App. 3d 400 (1981)
.
 
We do not agree, however, that the cases cited stand for such a narrow proposition of law.
  Moreover, we believe these early cases must be considered in their historical context, as predating the adoption of 
the Uniform Commercial Code (UCC) (810 ILCS 5/1-101 
et seq. 
 (West 1992)). 

Prior to the adoption of the UCC, the apparent lack of mutuality of obligations under requirements contracts, by allowing buyers seemingly unlimited discretion in performance, posed a problem for the Illinois courts seeking to enforce such contracts.  Thus, in early cases, like 
Chalmers & Williams
,  
Minnesota Lumber
 and 
National Furnace
,
 the courts found it necessary to impose a duty on buyers to continue their businesses and purchase approximately the same quantity from the sellers as when the contract was first entered into, in
 order to establish a mutuality of duties sufficient to validate the requirements contract.
 Section 2-306(1) of the
 UCC, however, eliminated this mutuality problem by formally recognizing the validity of requirements contracts and placing a duty upon a buyer to conduct its business" in good faith and according to commercial standards of fair dealing in the trade" (810 ILCS Ann. 5/2-306(1), UCC Comment 2, at 148 (Smith -Hurd1993)).
  Although the UCC 
does not displace prior case law (see W. Davenport, D. Murray 
& D. Cassling,
 2A Illinois Practice, Comment 2 at 148 (1997)), we read these pre-UCC decisions today as standing for the principle that a buyer may not terminate its requirements in bad faith, rather than as imposing a duty to remain in business.  

 We likewise disagree with plaintiff's citation to 
M.I.G. Investments, Inc. v. Marsala
, 92 Ill. App. 3d 400 (1981),
 for the proposition that a buyer necessarily breaches its duty to a seller if it discontinues its business during the life of a requirements contract.  In 
M.I.G. Investments
, plaintiff was the owner of a dump site who
 entered into a two-year contract with defendant,
 a disposal service, which provided that defendant would dump all refuse it retrieved within a 50-mile radius at plaintiff's site.  
About a year into the contract, the defendant sold its business to a third party under a sales agreement which provided that the buyer would pay the purchase price for the business in monthly installments. 
Neither the buyer nor the defendant dropped any more refuse at plaintiff's site following the sale, and defendant never informed plaintiff of the sale.  A few months after the sale, the buyer defaulted on its payments and the defendant resumed the business. When plaintiff eventually learned of the sale, it brought an action for breach of contract, seeking damages from the defendant from the time of the sale onwards.  At trial, the defendant contended it did not use plaintiff's dumps site because the roads leading there were in disrepair and caused costly damage to its trucks. Plaintiff presented evidence strongly refuting this claim, and the trial court found for plaintiff but did not award damages for the time during which the buyer owned the business. 
M.I.G. Investments, Inc.
, 92 Ill. App. 3d at 402-03.
 The appellate court reversed, finding the defendant liable for damages during the time the buyer possessed the business, because the sale was a secured transaction and defendant retained the rights of a secured party in relation to the business. 
M.I.G. Investments, Inc.
, 92 Ill. App. 3d at 404-05.

Plaintiff construes this case to mean that a buyer which sells its assets to a third party during the life of a requirements contract is necessarily liable to the seller for breach of that contract if the third party does not assume the contract.
 Clearly, where a seller of a requirements business retains an interest in the business, the continuing interest will bind it to the requirements contract, as when a business is sold under a secured transaction. This, however, is not the situation presented under the facts of the instant case. Moreover, what plaintiff ignores in the above case decision is that liability ultimately stemmed, not from defendant's act of selling its business and terminating its  requirements, but from defendant's demonstrated lack of good faith in so doing.  T
he duty of good faith, implicit in every requirements contract, however, is not synonymous with a duty to stay in business. Accordingly, w
e reject plaintiff's contention that the sale of assets to Pinnacle, in and of itself, constitutes evidence of a breach of duty.   

Plaintiff alternately argues that even if a requirements contract does not
 
per se
 impose a duty upon a buyer to remain in business, the language of the contract and 
the surrounding circumstances in this case gave rise to an implied duty that defendant would remain in 
business.  Specifically, plaintiff contends that section 6.02 of the contract, 
providing"[t]his [a]greement shall be binding upon the parties and their successors and permitted assigns,"
 gave rise to an implied promise by the defendant to remain in business or sell its business only upon agreement of a purchaser to assume the contract. 
 Additionally, plaintiff contends a promise to stay in business should be implied in this case to avoid unfairness, because plaintiff agreed to accept partial payment in trade credits, which were worthless to it
, pursuant to section 4.01, only upon condition that defendant agree to a five-year term under the contract. 
 

We are unaware of any Illinois authority speaking directly to the issue of when a duty to remain in business arises.
 
 A review of case law from other jurisdictions reveals, however, that 
courts have often found an implied duty to remain in business 
where a seller has made extraordinary expenditures and investments in expectation of the continuation of the buyer's business, or where a termination of the requirements business would place a grossly disproportionate burden upon a seller because of the kind of undertakings contemplated by the contract
.  Under this rationale,
 
the Court of Appeals for the Third Circuit in 
Diamond Alkali Co. v. P.C. Tomson & Co.
, 35 F.2d 117 (3d
 Cir. 1929),
 held that a buyer, which agreed to purchase all its sodium bicarbonate requirements from a seller for a  period of five years, had an implied duty to maintain its business, where the seller expanded its manufacturing plant in expectation of the continuation of buyer's requirements.
 Likewise, i
n 
Texas Industries, Inc. v. R.P. Brown
, 218 F.2d 510 (5th
 Cir.  1955), the Court of Appeals for the Fifth Circuit
 found that a buyer, which agreed to purchase all of its requirements for aggregate from seller for a period of  five years, had an implied duty to remain in business, where the seller built a new plant in order to meet the buyer's needs.  In
 
Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.
, 874 F.2d 1346 (10th
 Cir. 1989) as well, the 
Court of Appeals for the Tenth Circuit
 found that a buyer, which had agreed to buy all its electrical power requirements from a seller for 33 years, had an implied duty not to sell its assets during the term of the contract, where the seller built new facilities and incurred substantial debt on federal loans obtained in expectation of the continuation of business.
 
 Nevertheless, the court there noted that such a duty arises in limited situations, in exception to the general rule that"a seller assumes the risk of all good faith variations in a buyer's requirements, even to the extent of a determination to liquidate or discontinue the business."  
Tri-State Generation & Transmission Ass'n, Inc.
, 874 F.2d at  1359, quoting 
HML Corp. v. General Foods Corp.
, 365 F.2d 77, 81 (3d
 Cir. 1966). 

 
 In the instant case, w
e find neither the language of the contract nor surrounding circumstances can be reasonably construed as imposing a duty upon defendant to remain in business.  To begin, we disagree with plaintiff's contention that section 6.02, binding the parties and their successors under the contract, 
constituted a promise by defendant to either continue its business or dissolve its business only upon agreement that a third party assume the contract. Although this provision establishes successor liability on the contract, we do not read this as a limitation on defendant's discretion to eliminate its requirements and liquidate its assets in good faith. We likewise reject plaintiff's contention that 
because it agreed to accept partial payment in trade credits only upon condition that defendant agree to a five year term, a duty to remain in business must be implied to avoid unfairness. The problem with this argument is in presupposing that, by agreeing to a five-year term, defendant necessarily bargained away its right to exercise its business discretion in good faith.  T
he right of a buyer to exercise its good-faith discretion under a requirements contract is the rule, however, rather than the exception.  Obviously, there are exceptional cases, like those set forth above, where a seller's demonstrated reliance is so great that, above and beyond the duty of good faith, justice dictates
 the imposition of a duty that a buyer remain in business.  We cannot say, under the facts presented, that this is one of those cases.

 Finally, plaintiff contends that the trial court's entry of summary judgment was erroneous because the evidence raises an inference that defendant acted in bad faith. In support of this contention, plaintiff points to the evidence showing 
that: (1) defendant estimated its sales would increase in 1996; (2) defendant's decision to sell its assets was part of the economic strategy of its parent company, Huhtamaki Oy
, which sought to concentrate on its food packaging businesses, although it
 could have invested up to $60 million in defendant's enterprise; and (3) defendant offered no added incentive or consideration to Pinnacle 
to assume the contract with plaintiff.  
 

Neither the UCC nor case law establishes a bright line test for determining what constitutes bad faith in the discontinuance of a requirements business. The UCC defines "good faith" simply as "honesty in fact in the conduct or transaction concerned."  810 ILCS 5/1-201 (West 1992).  Although it is clear under this definition that a buyer which terminates its business in order to evade its obligations under a requirements contract acts in bad faith, it is equally clear, under
 section 2-306(1), that a buyer may reduce its requirements to zero or discontinue its business altogether in good faith. 810 ILCS Ann. 5/2-306(1), UCC Comment 2, at 148 (Smith -Hurd1993)("variations from prior requirements are permitted even when the variation may be such as to result in a discontinuance"). 
 Requirements contracts, by their nature, however, entail a sharing of risk between buyer and seller.  While the buyer assumes the risk of  less urgent changes in its economic circumstances,
 the seller assumes the risk of a changes in the buyer's business that makes continuation of a requirements contract unduly costly. 
 
Empire Gas Corp. v. American Bakeries Co.
, 840 F.2d 1333, 1340 (7th
 Cir. 1988).
  Thus, if a buyer has a legitimate business reason for eliminating its requirements business, rather than a desire to avoid its contract, it acts in  good faith.  
NCC Sunday Inserts, Inc. v. World Color Press, Inc.
, 759 F. Supp. 1004, 1009 (S.D.N.Y. 1991).  In cases where a buyer has reduced or eliminated its requirements, the essential inquiry is: did the buyer have a legitimate business reason for doing so or did it merely have second thoughts about the terms of the contract and a desire to get out of it?  
Empire Gas Corp.
, 840 F.2d at 1341; 
NCC Sunday Inserts, Inc.
, 759 F. Supp. at 1009.

In this case, we find nothing in the record or the evidence cited by plaintiff to raise an inference that defendant acted in bad faith.
  It is uncontested that defendant, and the entire trading card industry, experienced severe declines in sales between 1991 and 1995 and that defendant suffered close to an $8 million
 loss when it determined to discontinue its business.  In sum, the evidence established that defendant was in economic duress and had a legitimate business reason to terminate its requirements business.  Although the evidence also showed that defendant's parent company, Huhtamaki Oy,
 could have borrowed money and invested it in defendant and that defendant estimated its sales could increase in 1996, we do not believe these facts alone raise an inference of bad faith.  While evidence of more than minor changes in its economic circumstances is necessary to show good faith,
 a defendant is not required to adduce evidence sufficient to implicate a contract's force majeure clause or to establish the affirmative defense of impossibility, impracticability or frustration of purpose.  
Empire Gas Corp.
, 840 F.2d at 1340. 
 Here, the mere fact defendant could have continued its business does not undermine its claim that it had legitimate business reasons for not doing so.
 

Nor do we find the evidence that defendant took into account the strategy of  its parent company, to 
focus on food packaging, raises an inference of a bad-faith motivation.
  Inevitably, in any case involving a business owned by a parent corporation,  factors outside the immediate economic viability of the business will be taken into consideration when deciding whether to terminate the business, because the business exists within in a larger corporate structure.  Although these factors alone may not constitute good-faith reasons for termination, we do not believe the existence of other factors, beyond immediate economic circumstances, in and of itself  creates an inference of bad faith in such a situation.  
Likewise, we disagree with plaintiff's contention that defendant's failure to offer added consideration to Pinnacle for purposes of assuming the contract constitutes evidence of bad faith. As previously stated, the seller under a requirements contract assumes the risk of a change in a the buyer's business that makes a continuation unduly costly.  I
f a seller wishes to reallocate some of the risks inherent in such a contract, however, it may specify some minimum requirement. 
Brewster of Lynchburg, Inc. v. Dial Corp
., 33 F.3d 355, 365 (4th
 Cir. 1994).  Here, plaintiff assumed the risk that defendant could suffer a change of economic circumstances, which would drive it to liquidate its assets and discontinue its requirements.  Plaintiff could have protected itself against this contingency by including a minimum requirement but chose not to.  In the absence of express terms to the contrary, good faith did not require that defendant protect plaintiff against a termination of requirements by insuring assignment of the contract, even in the event of liquidation. 

Plaintiff additionally cites to 
NCC Sunday Inserts, Inc. 
, 759 F. Supp. 1004,
 asserting the facts there are analogous to the present case. 
 In 
NCC Sunday Inserts
, a seller of printing services bought an action against a buyer that produced advertising inserts, alleging that the buyer breached its contract to buy press services from the seller for five years when it sold its assets to a third party and terminated its contract with the seller. The buyer moved for summary judgment on the claim, arguing it terminated its business in good faith because it faced catastrophic financial losses if it stayed in business. The seller countered  with evidence showing the buyer represented to the third party at the time of the sale that its losses were only temporary and it expected to turn significant profits in two years time. The court denied summary judgment, finding it to be a question of fact of whether it was bad faith for the seller to sell its business when it would incur losses for two years but then turn a significant profit.  
NCC Sunday Inserts, Inc. 
, 759 F. Supp. at 1010. 

 The record in this case similarly reveals that defendant estimated its sales could increase, from $47 million in 1995 to $69,800,000
 in 1996.
  However, the record also indicates that even if defendant's net sales had met the estimated level, this represented only about half of the sales defendant enjoyed in 1991, when its net sales totaled $134 million.  In sum, unlike the case above, the evidence here does not suggest that defendant's poor economic situation was only temporary  and would change significantly in the near future.  Moreover, unlike the buyer in 
NCC Sunday Inserts
, defendant here
 did not terminate its contract with plaintiff, but instead assured plaintiff that it would continue to purchase any requirements for prepress services, in accordance with the contract. That defendant did not require or purchase any more prepress services from plaintiff, in itself, is not evidence of bad faith, as this was the risk plaintiff assumed by entering into a requirements contract, instead of a fixed quantity contract.

 
We recognize that whether a party has acted in good faith is generally a question of fact for the jury. 
Case v. Forloine
, 266 Ill. App. 3d 120, 125 (1993).  However, in order to survive a motion for 
summary judgment, 
a plaintiff must present some evidence to support an allegation of bad faith. 
Richter v. Burton Investment Properties, Inc
.
, 240 Ill. App. 3d 998,
 1002 (1993) (at the summary judgment stage, a plaintiff must offer some evidence to support its allegations). 
 
Here, the evidence demonstrates defendant suffered dramatic declines in its sales and had a legitimate business reason for discontinuing its requirements business. 
  
The evidence presented by plaintiff neither refutes this claim nor raises an inference of bad faith.
  Absent contract language, appreciable party reliance, or evidence of evasion,
 a requirements business does not give up its fundamental managerial right of disengaging from an unprofitable business, and the courts should avoid usurping that right through a restrictive interpretation of good faith.
  See M. Finch, 
Output & Requirements Contracts: The Scope of the Duty to Remain in Business
, 14 U.C.C.L.J. 347, 366 (1982).
 
 In this case, there is no evidence that defendant acted other than in good faith with reference to the contract. Accordingly, we affirm the trial court's order granting defendant's motion for summary judgment.

Affirmed.

O'MARA FROSSARD, and COHEN, JJ.
(footnote: 1), concur.

FOOTNOTES
1:
Justice Rakowski heard oral argument on this case.  Upon his retirement, Justice Cohen was substituted and has reviewed the record, briefs and audio recordings of the oral argument.