NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0884n.06
Filed: November 4, 2005

**No. 04-6200**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

WISECO, INC.,                                          )
                                                       )
      Plaintiff-Appellant,                         )
                                                       )
v.                                                     )    ON APPEAL FROM THE UNITED
                                                       )    STATES DISTRICT COURT FOR THE
JOHNSON CONTROLS, INC.,                                )    EASTERN DISTRICT OF KENTUCKY
                                                       )
      Defendant-Appellee.                          )

Before:  NELSON and SUTTON, Circuit Judges; ZATKOFF, District Judge.[*]

SUTTON, Circuit Judge.  Wiseco, Inc., a Kentucky-based tool-and-die company, seeks review of a ruling summarily rejecting its claim that Johnson Controls, Inc. (JCI) breached a requirements contract between the two companies.  Because Wiseco has failed to establish a material fact dispute that JCI acted in bad faith in reducing its requirements under the contract, we affirm.

I.

In 1998, JCI produced metal headrest stays for several DaimlerChrysler vehicles.  In December of that year, an employee at JCI's Foamech plant in Georgetown, Kentucky sought to out-

_____

[*]The Honorable Lawrence P. Zatkoff, Senior United States District Court Judge for the Eastern District of Michigan, sitting by designation.

source two aspects of the stay-manufacturing operation to Wiseco: bending the metal rods into a staple shape and chamfering (rounding) the ends. The parties agreed orally that Wiseco would prepare the necessary tooling for the job at its own expense and that it would receive 50¢ per part with a manufacturing capacity of approximately 4000 parts per day (with actual requirements to be set by DaimlerChrysler's needs). JCI also informed Wiseco that the life of the part was at least four years, which Wiseco took to be the expected term of the contract. Using manufacturing plans for the part provided by JCI, Wiseco "tooled-up" for the production, which is to say it bought and prepared equipment to handle the manufacturing work, and for six months produced approximately 4000 parts per day, which were then sent to the Foamech plant for finishing (notching and applying protective coating) before being shipped to JCI's Tillsonberg, Canada plant for assembly into finished headrests.

About six months after beginning production, JCI told Wiseco that it soon would be terminating orders of part 684F, as the part Wiseco had been producing was called—and indeed over the next six months JCI's requirements for the part decreased substantially. At the same time, however, JCI asked Wiseco to take over the finishing functions for part 684F, formerly performed by JCI at its Foamech plant, so that not only would Wiseco bend and chamfer the rods, it also would notch and finish them, creating a finished part referred to as 684B. While JCI's orders to Wiseco for part 684B were well under 4000 parts per day, the company paid Wiseco more for its additional work.

According to JCI, the decline in its requirements for parts 684F and 684B stemmed from changes at DaimlerChrysler. Originally part 684F was used in DaimlerChrysler's 1999 Cherokee and 1999 Grand Cherokee models. The part was not used in the 2000 Grand Cherokee and subsequent models, but part 684B was used in the 2000 and 2001 Cherokee. DaimlerChrysler retired the Cherokee after the 2001 model year.

The newer Grand Cherokee's headrest used part 611, a metal rod that is 40 millimeters longer than part 684, has two additional notches and is chamfered to pointed rather than rounded ends. Part 611 was made by Guelph Tool and Die, a company located near the Tillsonberg, Canada plant where the headrests were finally assembled.

On May 14, 2001, Wiseco sued JCI in Kentucky state court for breach of the 684 contract as well as claims relating to several other parts that Wiseco manufactured for JCI. JCI removed the case to federal court based on diversity jurisdiction. After numerous thrusts and parries over a proposed preliminary injunction designed to prevent JCI from pulling other business from Wiseco (denied) and after extensive discovery on all of the claims, Wiseco voluntarily dismissed with prejudice all but its 684F contract claim on October 3, 2003. Initially, with respect to that claim, the district court granted partial summary judgment for Wiseco, ruling that JCI and Wiseco had formed an oral requirements contract under KRS § 355.2-306(1) for the production of part 684F that was ratified, but not controlled, by subsequent purchase orders. At some point after this ruling, Wiseco made several requests for additional discovery to determine whether JCI was buying parts from other suppliers that were "substantially" the same as part 684. The district court allowed further

No. 04-6200
*Wiseco, Inc. v. Johnson Controls, Inc.*

discovery and a further deposition but limited it to "the headrest assembled at the Foamech plant." Dist. Ct. Op. at 3. On Aug 31, 2004, the District Court granted summary judgment to JCI. In doing so, it concluded that "JCI purchased all of its requirements for part 684 from Wiseco and did not breach the contract in this regard" and that because there was no proof that any replacement part was ever used in "any headrest assembled in the Foamech plant," the undisputed evidence showed that JCI had reduced its requirements in good faith. Dist. Ct. Op. at 18.

II.

We review a district court's grant of summary judgment de novo. *Beecham v. Henderson County*, 422 F.3d 372 (6th Cir. 2005). Summary judgment should be granted where the party tasked with the burden of proof at trial fails to establish a factual dispute about the existence of an element essential to its case. *Id* at 374.

As with many contract disputes, this one would not have fueled such long and costly litigation had the parties adequately memorialized their intentions. Despite that failing, the district court concluded that the parties' oral agreement was effectively removed from the statute of frauds and became a valid requirements contract through JCI's purchase orders, notwithstanding the conflicting terms of those later writings. The U.C.C.'s statute-of-frauds provision appears to demand little of the writing that confirms an oral "agreement." *See* § 355.2-201(1); 1 Official Comments to U.C.C. §2-201; *O'Sullivan v. Duro-Last, Inc.*, Nos. 99-2190, 99-2373, 00-1521, 2001 U.S. App. LEXIS 5859 (6th Cir. March 28, 2001) (concluding that a letter following an oral

agreement, even though non-conforming, removed the agreement from the statute of frauds); *C. Itoh & Co. v. Jordan Int'l Co.*, 552 F.2d 1228, 1233 (7th Cir. 1977) (noting that it is easier to remove an oral agreement from the statute of frauds than to modify it under the U.C.C.). While JCI challenges the enforceability of this oral agreement as an alternative ground for affirmance here, it does so solely on the ground that its purchase orders constitute the whole contract between the parties, despite the fact that the purchase orders, in order to be binding, explicitly require Wiseco's signature and Wiseco never signed the orders. Given the dearth of attention paid to this matter in the appellate briefs and given the reality that the existence of the contract does not change the outcome of the case, we will accept (for purposes of argument) the district court's ruling on this point.

That leaves the issue we will resolve: Did JCI's significant reduction in its requirements for part 684 six months after production began breach this requirements contract? Under the U.C.C., as adopted in Kentucky and as adopted in almost every jurisdiction, a requirements contract demands that the buyer order from the seller "such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate . . . may be tendered or demanded." KRS § 355.2-306(1). With just one exception, courts addressing this provision have concluded that it applies differently to increased and decreased requirements. "[T]he majority of authorities have construed U.C.C. § 2-306(1) as permitting good faith reductions in requirements, as opposed to increases, even though the reductions may be highly disproportionate to stated estimates." *Godchaux-Henderson Sugar Co., Inc. v. Dr. Pepper-Pepsi Cola Bottling Co.*, No. 83-5730, 1985 U.S. App. LEXIS 14121, at *18 (6th Cir. August 29, 1985); *see also Brewster*

*of Lynchberg, Inc. v. Dial Corp.*, 33 F.3d 355, 364–65 (4th Cir. 1994); *Empire Gas Corp. v. Am. Bakeries Co.*, 840 F.2d 1333, 1337 (7th Cir. 1988). In view of this distinction, courts generally have concluded that "the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business." *Empire Gas*, 840 F.2d at 1337–38; *Brewster*, 33 F.3d at 365; *see also U & W Industrial Supply, Inc. v. Martin Marietta Alumina, Inc.*, 34 F.3d 180, 188 (3rd Cir. 1994).

Whether a breach occurred in this case, then, depends in part on Kentucky's understanding of the good faith required by KRS § 355.2-306. While no Kentucky or Sixth Circuit case evaluates the meaning of good faith under Kentucky's U.C.C. law, Judge Posner's decision in *Empire Gas Corporation v. American Bakeries Co.*, 840 F.2d 1333 (7th Cir. 1988), appears to be the most frequently consulted case in analyzing the good faith component of a requirements contract under the U.C.C. *See, e.g.*, *A & A Mech., Inc. v. Thermal Equip. Sales*, 998 S.W.2d 505, 512 (Ky. Ct. App. 1999) (relying upon *Empire Gas* in determining Kentucky requirements-contract law). In *Empire Gas*, the court explained that a requirements contract is not an option contract and thus the decision to forgo purchasing goods under the contract cannot be made for any reason or for no reason at all. 840 F.2d at 1339–40. The "good faith" requirement, the court reasoned, places several constraints on the buyer: The buyer may not purchase the good in question from another seller; the buyer may not "merely have had second thoughts about the terms of the contract"; and the "buyer assumes the risk of [small] change[s] in his circumstances." *Id.* at 1340–41. At the same time, the buyer does

not act in bad faith if it reduced its requirements for "business reasons . . . independent of the terms of the contract or any other aspect of its relationship with the [seller]." *Id*. at 1339.

In applying this good-faith rule, several court decisions have helped to clarify its contours. *Empire Gas* dealt with a contract to shift the energy supply for a bakery's delivery fleet from gas to propane. The court found bad faith when the buyer sought to reduce its requirements to zero and the seller established evidence that the buyer's fleet size and ability to pay remained unchanged, a charge that the buyer did not (and apparently could not) rebut. *Empire Gas*, 840 F.2d at 1341. The First Circuit had found no bad faith when a buyer chose to shut down an unprofitable manufacturing plant and ended its requirements under a supply contract as a result. *Brewster*, 33 F.3d at 366. To like effect, several other cases have found no bad faith for reducing and eliminating orders where the buyer wanted to reduce existing inventory, where an existing operation had become more efficient, where the buyer's customers no longer required the product or where a part was needed less than expected. *See U & W Industrial*, 34 F.3d at 187; *Technical Assistance Int'l, Inc. v. United States*, 150 F.3d 1369, 1373 (Fed. Cir. 1998); *Tri-State Generation and Transmission Assoc., Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1356 (10th Cir. 1989); *Vulcan Materials Co. v. Atofina Chems. Inc.*, 355 F. Supp. 2d 1214, 1234 (D. Kan. 2005).

The seller bears the burden of demonstrating bad faith. *See Technical*, 150 F.3d at 1373 ("In the absence of such a showing [of bad faith], the buyer will be presumed to have varied its requirements for valid business reasons, i.e., to have acted in good faith, and will not be liable for the change in requirements."); *Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541, 545–46

(3d Cir. 1991); *Tigg Corp. v. Dow Corning Corp.*, 962 F.2d 1119, 1123–24 (3d Cir. 1991); *Tri-State Generation*, 847 F.2d at 1372; *Schawk, Inc. v. Donruss Trading Cards, Inc.*, 319 Ill. App. 3d 640, 651 (Ill. App. Ct. 2001).

When it comes to the application of these cases here, JCI argues that Wiseco met all of its requirements for part 684F and part 684B and that no other company ever sold that part to JCI. Wiseco initially supplied the headrest stay for the Jeep Cherokee contract as well as for the Jeep Grand Cherokee contract—using part 684F and part 684B. But DaimlerChrysler asked JCI to produce longer metal rods to allow for an additional notch in the headrest stay for the Jeep Grand Cherokee. And JCI's engineering department requested that the ends of the Jeep Grand Cherokee headrest stay be chamfered differently, with pointed ends instead of rounded ones, for ease of assembly. As JCI sees the matter, once DaimlerChrysler "ceased to have requirements" for the part in question, that became "a good faith" reason for shrinking orders, and the change in orders accordingly did not amount to "a breach of contract." *See Tri-State Generation*, 874 F.2d at 1360. Likewise, the decision of JCI's engineering department to alter the specifications for the parts was a legitimate business reason for reducing requirements because it would be "unreasonable" to make JCI continue to manufacture with inefficient parts simply to honor a requirements contract. *See Empire Gas*, 840 F.2d at 1340; *Sw. Natural Gas Co. v. Okla. Portland Cement Co.*, 102 F.2d 630, 633 (10th Cir. 1939). Under these circumstances, without some evidence that it had continuing needs for part 684, JCI contends that its circumstances changed in a material way and that it accordingly did not breach the requirements contract. *Cf. Empire Gas*, 840 F.2d at 1339.

Wiseco responds that the allegedly different part is substantially the same part. To substantiate this claim, Wiseco introduced an expert report concluding that the 684 parts were substantially similar to part 610. *See* Report of David Smith, JA 596–622. But part 610 is used in European production of the Chrysler Grand Cherokee. The part was made from November 1999 to August 2000 by Guelph Tool and shipped directly to Austria by the supplier. There is no indication that Wiseco ever supplied part 684 for use in the European Chrysler Grand Cherokee. All evidence suggests that each of the parts made by Wiseco was used only in the North American versions of the Jeep Cherokee and Jeep Grand Cherokee.

Wiseco next claims that part 684 mirrors part 611, the part that replaced the 684 in the 2000 Jeep Grand Cherokee and the later models of this Jeep. But in arguing that the parts are similar, Wiseco refers only to the expert report of David Smith, which as noted addressed only part 610. Wiseco thus has presented no evidence that the two parts are essentially one and the same. JCI, by contrast, introduced evidence about the differences between the parts, namely that the rods used to make part 611 were 40 millimeters longer and that the two rods were chamfered differently. JCI also introduced evidence that it would take substantial retooling to produce the 611 instead of the 684. And to produce the two parts interchangeably on the same equipment, JCI showed, would cost over $20,000, and the transition would take eight weeks. On this record, we cannot conclude Wiseco has met its burden of establishing a triable issue of fact that JCI reduced requirements under the 684 contract in bad faith simply by identifying the existence of a part that succeeded 684 in the construction of the Grand Cherokee headrest.

Doubtless, the law would not permit JCI to change the number of the part that Wiseco was manufacturing to avoid the demands of a requirements contract. But Wiseco has not supported its burden of proof in bringing this claim. And lacking sufficient evidence to prove such a claim, Wiseco began expanding its premise, from a contract to produce a particular part, to a contract to produce similar parts, to a contract to produce all headrest stays, regardless of the part involved, for all Jeep vehicles. Because the requirements contract recognized by the district court made no such promise and because the good-faith restrictions imposed on the buyer by the U.C.C. impose no such requirement, the district court correctly rejected this claim.

On top of the difference between the parts—whether between the 684 and the 610 or between the 684 and the 611—JCI offered another reason for the change: the shift in production and finishing of the headrest stays from the Foamech plant in Kentucky to a plant in Tillsonberg, Canada. When Wiseco and JCI together produced the final part 684 at the Foamech plant, JCI shipped the finished stays to Tillsonberg for assembly into the final headrest. JCI based its decision to manufacture part 611 at the Canada plant on business efficiencies (shipping costs, time delay, etc.) and on its conclusion that the Foamech plant had repeatedly failed to produce parts effectively, both of which constitute legitimate business reasons independent of the terms of the contract with Wiseco. *Cf. Technical*, 150 F.3d at 1373; *Brewster*, 33 F.3d at 366. Wiseco never offered any evidence to rebut these legitimate business reasons, and in fact acknowledged that it did not know why JCI had shifted manufacture of the headrest stays to Canada. This additional explanation for

the decline in part 684 orders also supports the district court's decision to reject this claim as a matter of law.

Wiseco offers one further response to the claim that it failed to meet its burden of demonstrating bad faith. It contends that because the district court limited its interpretation of the requirements contract to parts produced for JCI's Foamech plant, Wiseco was not given sufficient discovery to show that JCI acted in bad faith. The truth of the matter, however, is more complex. Wiseco initially was granted wide-ranging discovery to seek information about how JCI had violated contracts on several different parts, including the 684 parts. Then, one week before trial, Wiseco sought further discovery. The court granted the discovery request but limited it to discovery regarding the "headrest assembled at the Foamech plant," which had not been a limitation on earlier discovery. Attempting to convince the court to alter its ruling, Wiseco argued several times that this limitation was unreasonable. While the court did not remove this limitation, it did allow a further deposition to be taken of Kenneth Tidd, a JCI employee, to determine the basis for the company's contention that Wiseco produced all of the 684 parts. That deposition led to information about parts 610 and 611, which Wiseco (as we have seen) attempted to use to bolster its claim of bad faith.

Appellate challenges to the scope of discovery receive abuse-of-discretion review, *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001), a standard that Wiseco cannot overcome. Wiseco claimed in its original complaint that JCI breached the 684 contract and as a result it received discovery on this claim in the initial discovery phase. That Wiseco later dismissed all of its other claims does not

guarantee further discovery on its only remaining claim later in the case. *See Tate v. Boeing Helicopters*, 140 F.3d 654, 661 (6th Cir. 1998). The district court, even so, still allowed an additional 60 days of discovery, with the restriction that Wiseco limit its inquiries to headrest stays manufactured at Foamech. Despite this restriction, Wiseco discovered information about the most likely "replacement part," the 611, that JCI could have used instead of the 684 parts. While at the outset we would not have imposed this limitation on discovery—and neither did the district court—we can well understand why the district court chose to limit it here in the context of an "eve of trial" discovery request. The court did not abuse its discretion.

III.

For these reasons, we affirm.